## IN THE MATTER OF MORGAN

Docket Nos. 66888, 66889, 66907. Submitted October 5, 1983, at Manistique.—Decided February 6, 1985.

Jarvis Samuel Morgan, a minor, is the son of Dianne Morgan, a Chippewa Indian, and Anthony E. Morgan, a black. The Department of Social Services filed a petition to terminate the parental rights of Dianne and Anthony Morgan to Jarvis Morgan in the Mackinac Probate Court. The Sault Ste. Marie Tribe of Chippewa Indians was granted permission to intervene. The court, George J. Theut, J., applied a clear-and-convincing-evidence standard in ordering the parental rights of both parents terminated. Anthony Morgan, Dianne Morgan and the Sault Ste. Marie Tribe of Chippewa Indians each appealed separately and the appeals were consolidated by the Court of Appeals. *Held:*

A proceeding to terminate parental rights to an Indian child must meet the minimum federal standards established in the Indian Child Welfare Act which includes a provision that parental rights not be terminated unless there is proof beyond a reasonable doubt that the continued custody of the child by the parent or custodian is likely to result in serious emotional or physical damage to the child. The court erred in applying the clear-and-convincing-evidence standard.

Reversed and remanded with instructions.

INDIANS — CHILD CUSTODY — TERMINATION OF PARENTAL RIGHTS — INDIAN CHILD WELFARE ACT.

A proceeding to terminate parental rights to an Indian child must meet the minimum federal standards established in the Indian Child Welfare Act which includes a provision that parental rights not be terminated unless there is proof beyond a reasonable doubt that the continued custody of the child by the parent or custodian is likely to result in serious emotional

REFERENCES FOR POINTS IN HEADNOTE
41 Am Jur 2d, Indians § 8.7.
59 Am Jur 2d, Parent and Child §§ 5, 27, 39.
Validity of state statute providing for termination of parental rights. 22 ALR4th 774.

or physical damage to the child and some evidence that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful (25 USC 1912[f]).

*Norman K. Marsh,* for respondent Anthony E. Morgan.

*Peppler, Peppler & Peppler, P.C.* (by *Brian A. Peppler*), for respondent Dianne Morgan.

*Daniel T. Green,* for intervenor-appellant Sault Ste. Marie Tribe of Chippewa Indians.

Before: R. M. MAHER, P.J., and J. H. GILLIS and GRIBBS, JJ.

R. M. MAHER, P.J. Respondents, Anthony and Dianne Morgan, joined by intervening respondent, Sault Ste. Marie Tribe of Chippewa Indians, appeal as of right from the trial court's termination of respondents' parental rights over their son, Jarvis. On appeal, respondents and intervenor join in arguing that the trial court improperly terminated parental rights because the court failed to comply with the minimum federal requirements established by the Indian Child Welfare Act, 25 USC 1901-1963. Both parents also argue that, assuming the Indian Child Welfare Act was inapplicable to this case, the trial court nevertheless erred by terminating parental rights in the absence of clear and convincing evidence that the parents had neglected their son. Finally, respondent Dianne Morgan also argues that the trial court exceeded its jurisdiction by ordering Jarvis into temporary wardship of the court at the close of the adjudicative phase of the proceedings.

Jarvis Morgan was born in September, 1977. His mother is a Chippewa Indian and his father is

black. At the time Jarvis was born, Dianne was 16 years old and was not permitted to marry Anthony Morgan. She subsequently voluntarily relinquished her parental rights to Jarvis. For the next 28 months, Jarvis lived with foster parents, Colonel Lester Brimmer, Jr., and Mary Brimmer.

Jarvis was returned to his parents on December 17, 1979, after the probate court restored Dianne's parental rights and dismissed its jurisdiction over Jarvis. This occurred after Dianne reached the age of 18, married Anthony, and the parents reestablished their parental relationship with Jarvis. In reestablishing this relationship, both parents regularly visited Jarvis at the Brimmer home and became friendly with the Brimmers.

Jarvis lived with both parents in Louisiana until June, 1980. At that time, Dianne, now pregnant, returned to Michigan to be with her ailing mother. In July, 1980, Dianne went into labor and requested that the Brimmers take Jarvis while she was in the hospital. Jarvis stayed with the Brimmers but was returned to his mother when the labor proved to be false. One week later, however, Dianne went into actual labor and again requested that the Brimmers care for Jarvis while she was in the hospital. Jarvis eventually stayed with the Brimmers for two and one-half months before returning to his mother. Jarvis remained with his mother for five weeks. At that time, Dianne asked the Brimmers to take Jarvis again as she was having problems dealing with him. From December 8, 1980, until approximately April 12, 1981, Jarvis stayed with the Brimmers with the exception of a one-week stay with his mother in January. On approximately April 12, 1981, Dianne called the Brimmers, stated that her husband was returning, and requested that the Brimmers return Jarvis to her. On April 18, 1981, the Depart-

ment of Social Services filed a petition seeking immediate temporary wardship over Jarvis and alleging that Dianne and Anthony Morgan had "when able to do so, neglect[ed] or refuse[d] to provide proper or necessary support, education as required by law, medical, surgical or other care" for Jarvis or had abandoned or deprived Jarvis of emotional well-being. The petition specifically alleged that "since the 31st day of August, 1980, and with the exception of the period 10/28/80 to 12/03/80 Jarvis Morgan has been abandoned by his parents and they have failed to contact or support him through this period". Other allegations were also raised, including a claim that Jarvis was showing "emotional trauma by trembling, twisting his hair, not talking for extended periods, staring and having nightmares". The petition was authorized by the probate court and Jarvis was temporarily placed under the wardship of the court.

On June 8, 1981, the adjudicational phase of the proceedings was held. Patrick Murphy of the Mackinaw County Department of Social Services testified that prior to the authorization of the petition on April 18, 1981, Jarvis had been voluntarily placed by his parents with the Brimmers. Murphy agreed that this was an appropriate placement and stated that Dianne Morgan had maintained contact with Jarvis while he was at the Brimmer house, although Anthony Morgan (then in Louisiana) had not. Murphy stated that the petition was filed in April because Dianne Morgan had given the Brimmers winter clothing for Jarvis that was larger than his current size and had said that Jarvis would need it for school. Murphy felt that a move had to be made "for the betterment of the child" when he heard this because it suggested Jarvis would be left with the Brimmers through school. He also felt that wardship was necessary to

prevent the Brimmers from having to pay for medical coverage and clothing for Jarvis. Finally, he was disturbed because he had heard that Jarvis was experiencing emotional problems.

Lester and Mary Brimmer also testified at the hearing. They stated that Anthony Morgan had never provided financial support to them for caring for Jarvis, although they admitted that they had never asked either Anthony or Dianne Morgan for support money. Lester Brimmer also testified that Anthony had not visited Jarvis in the Brimmer home since June, 1980.

Testimony on behalf of the parents was provided by respondent Anthony Morgan and Viva Lewis, Dianne Morgan's mother. Anthony Morgan stated that he had gone to Louisiana to find work but had been unable to find anything permanent. He had attended school on the GI Bill and had held temporary work. When his wife had returned to Michigan to be with her mother, he sent $450 with her and had continued to send money whenever she had requested it. Finally, he had not visited Michigan since his wife left because he had expected her to return to Louisiana and because the trip took 38 hours by bus and cost $141 one-way. Viva Lewis's testimony was limited to a statement that she and Dianne had requested the Brimmers' help because "it was too hard to feed three people" on her wages.

At the close of this testimony, the probate court found that both parents had been neglectful and took jurisdiction over Jarvis. The court then ordered that the Morgans be granted full rights of visitation under the supervision of the DSS.

On November 2, 1981, a hearing to determine whether or not parental rights should be terminated was held. Prior to this hearing, the probate court had authorized the filing of a new petition by

DSS and had authorized intervention in the action by the Sault Ste. Marie Tribe of Chippewa Indians because Dianne and Jarvis Morgan were Chippewa Indians.

Testimony at the termination hearing established that the Morgans had not visited Jarvis more than four times at the Brimmers' since the adjudicative hearing. The caseworker assigned by DSS to the Morgan case, Elgie Dow, testified that the Morgans had called him to arrange other visits but these could not be arranged because their schedules conflicted with his. Dow would not permit visitation unless he could be present and he was not available for weekend visits when the Morgans were off work. Dow further testified that a succession of phone calls might be necessary to arrange a visit. He stated, however, that neither the Morgans nor their attorneys had ever complained to him about visitation.

Patrick Murphy, also of the Department of Social Services, testified that DSS policy did not require that Dow be present when the Morgans visited Jarvis. Dianne Morgan testified that she had complained to her attorney about visitation problems and that she had called Dow six to eight times regarding visitation, suggesting visitation on week nights, but that Dow had declined to arrange visitation for this time because it was too late in the day. Anthony Morgan testified that he had called Dow regarding visitation 15 to 20 times between June 22, 1981, and September 8, 1981. He had also called the Friend of the Court and offered to provide financial support for Jarvis but, when the matter was referred to DSS, his offer was turned down by Dow.

Elgie Dow also testified about the conditions in the Morgan home. He stated that the Morgans' relationship with their second child was normal

and healthy and that Dianne showed considerable affection for the child. DSS had not prepared a home study of either the Morgan or Brimmer home.

Other testimony on the Morgans' home was presented by Francis Kokko, a social worker with the Sault Ste. Marie Tribe of Chippewa Indians, Annie Jean Morgan, Anthony's mother, and Kathy Gause, Dianne's sister. Kokko testified that she had visited the Morgan home four times between May 6, 1981, and October 27, 1981, and had found the home to be extremely well kept. She also found them to have a good rapport with their second child, who was clean and well cared for. Annie Morgan testified that, while the family had lived with her in Louisiana, she had noticed that Dianne had been affectionate toward Jarvis but had been timid and had lacked experience due to her youth. Jarvis had never exhibited any fear of his parents. Kathy Gause had seen Dianne and Jarvis during a November, 1980, visit and testified that Dianne had cared for Jarvis but had not shown affection. However, this might have been attributed to the fact that Dianne had just given birth to her second child and was apart from Anthony at the time.

The Brimmers testified that Jarvis became upset when he believed he was being taken away from the Brimmers, whether by DSS or by the Morgans. Mary Brimmer also testified that Dianne had once told her that Jarvis made her very angry and that she sometimes thought that she might hurt him. She stated that after she had refused to return Jarvis to Dianne in April, 1981, because of Jarvis' fears of leaving the Brimmers, Dianne had told her to call DSS to arrange to "make it legal".

On the basis of this testimony, the probate court found in a September 8, 1982, opinion that there

was clear and convincing evidence of neglect and that it most likely would continue into the future. The court also found that, "generally speaking", the parents had had an opportunity to correct any neglect that existed. The court reached these conclusions after first finding that the placement of Jarvis with the Brimmers, after the original voluntary relinquishment of parental rights by Dianne when she was 16, constituted neglect. It found that this neglect was complemented by Anthony Morgan's failure to speak to or visit Jarvis at the Brimmer home and the failure of either Dianne or Anthony to give the Brimmers money for caring for Jarvis. The court noted that Patrick Murphy had testified that there was relatively no bond between the natural parents and Jarvis due to the lack of contact during the "formative" years and that, at the adjudicative stage, there had been evidence that marital difficulties existed between the parents "which would indicate that the Morgans were not able to create the type of home that would avoid neglect". Finally, the court found that the parents had neglected Jarvis because they had failed to visit him more frequently after the adjudicative hearing. The court resolved the conflict about the restriction of visitation rights by holding that, even if there had been interference by DSS, the Morgans had failed to bring this point to their attorney's attention and thence to the probate court's attention. The probate court did not find either that the interference had or had not occurred. Parental rights were then terminated.

Under 25 USC 1901 *et seq.,* child custody proceedings involving the foster care placement of or termination of parental rights to an Indian child are subject to specific federal procedures and standards. These standards were established by Congress for the following reasons, as stated in the

congressional declaration of policy found in 25 USC 1902:

"The Congress hereby declares that it is the policy of this Nation to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families by the establishment of minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture, and by providing for assistance to Indian tribes in the operation of child and family service programs."

Pursuant to these "minimum federal standards",

"Any party seeking to effect a foster care placement of, or termination of parental rights to, an Indian child under State law shall satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful [25 USC § 1912(d)];

"No foster care placement may be ordered in such proceeding in the absence of a determination, supported by clear and convincing evidence, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child [25 USC 1912(e)]; and

"No termination of parental rights may be ordered in such proceeding in the absence of a determination, supported by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child" [25 USC 1912(f)].

Finally, under 25 USC 1914, "any Indian child", "any parent or Indian custodian", and "the Indian child's tribe" may petition any court of competent jurisdiction to invalidate the foster care placement

or termination of parental rights under state law "upon a showing that such action violated any provision of sections 1911, 1912, and 1913 of this title".

In this case, it is undisputed that Jarvis Samuel Morgan is an "Indian child" within the meaning of the Indian Child Welfare Act. See 25 USC 1903(4).[1] The probate court acknowledged this fact and granted Sault Ste. Marie Tribe of Chippewa Indians the right to intervene in the action. Both parents are included within the definition of "parent" provided by 25 USC 1903(9), which defines "parent" as "any biological parent or parents of an Indian child * * *". Thus, the probate court in this action was required to apply the "minimum federal standards" provided by the act.

It is clear from the record that the federal standards were not followed at the dispositional stage of the state proceedings in this case. The probate court explicitly applied the "clear and convincing evidence" standard[2] for termination of the Morgans' parental rights, contrary to the higher "beyond a reasonable doubt" standard required by federal law. Contrary to the requirement of 25 USC 1912(f), the probate court reached its determination without the "testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child".[3] Finally, there was no attempt by the petitioner to show that "active efforts have been made to provide remedial services and rehabilita-

---

[1] See also *In the Matter of KABE,* 325 NW2d 840 (SD, 1982).

[2] See JCR 1969, 8.3(b).

[3] We note that the phrase "qualified expert witnesses" has twice been interpreted to apply to "expertise beyond the normal social worker qualifications". See *In re Welfare of Fisher,* 31 Wash App 550; 643 P2d 887 (1982); *In the Matter of MEM,* 635 P2d 1313, 1317-1318 (Mont, 1981).

tive programs designed to prevent the breakup of the Indian family" and that "these efforts have proved unsuccessful". These final requirements must also be shown "beyond a reasonable doubt" under 25 USC 1912, subds (d)-(f). *People in the Interest of SR*, 323 NW2d 885 (SD, 1982). In this case, however, the record strongly indicates that efforts were made by Mr. Dow to limit contact between the parents and Jarvis even though the probate court had expressly ordered liberal visitation and there was no policy reason for Mr. Dow to be present at visitation. We therefore reverse the probate court's order terminating the Morgans' parental rights.

This case presents a somewhat unusual situation in which the alleged "neglect" of the parents was their failure to actively exercise their parental role by keeping Jarvis with them or by visiting him while he was living in a foster home. No allegation of active abuse or of a failure to adequately care for Jarvis while he lived with his parents was raised by the petitioner. Under these circumstances, we remand this case to the probate court with directions to retry the case within 60 days from the date this opinion is released. The probate court has the discretion, however, to extend this period for retrial if, in the court's opinion it is reasonably necessary to permit the just adjudication of this matter. The court is to apply the appropriate federal standards found in 25 USC 1901 *et seq.* In the event that the petitioner chooses not to retry the case or is unable to meet the federally mandated burden of proof, Jarvis is to be returned to his parents. The family is then to be provided with the federally mandated "remedial services and rehabilitative programs designed to prevent the breakup of the Indian family".

As stated earlier, both parents have also challenged the probate court's termination order on state procedural grounds. Because we have found that the federal statute is the appropriate standard, we need not address this issue. Respondent Dianne Morgan has also challenged the probate court's assumption of jurisdiction over Jarvis at the adjudicative hearing on state grounds. However, this Court is without jurisdiction to review this claim as the claim is not being raised in a direct review. *In the Matter of Adrianson,* 105 Mich App 300; 306 NW2d 487 (1981).

Reversed and remanded.