In the Matter of the WELFARE OF
B.W., a/k/a B.G.

Nos. C4–89–1860, C3–89–1865.

Court of Appeals of Minnesota.

April 24, 1990.

438

William R. Kennedy, Hennepin County Public Defender, Peter W. Gorman, Asst. Public Defender, Kris Kolar, Law Clerk, Minneapolis, for appellant mother.

Robert R. Biglow, Minneapolis, for appellant father.

Hubert H. Humphrey, III, Atty. Gen., St. Paul, Thomas L. Johnson, Hennepin County Atty., Greg Gibson, Asst. County Atty., Ann Goering, Law Clerk, Minneapolis, for respondent.

Gerald M.B. Chester, Minneapolis, for guardian ad litem.

Constance S. Baillie, Minneapolis Legal Aid Soc., Minneapolis, for intervenor Omaha Tribe of Nebraska.

Janet C. Werness, Susan M. Cochrane, Southern Minnesota Regional Legal Services, Inc., St. Paul, for amicus curiae St. Paul American Indian Center.

Considered and decided by LANSING, P.J., and PARKER and RANDALL, JJ.

## OPINION

PARKER, Judge.

Sharon Goose and Cornelius Walker appeal the termination of their parental rights toward their son, B.W. They further appeal the trial court's refusal to transfer jurisdiction of this matter to the tribal court of the Omaha Tribe of Nebraska. They assert that the petitioner county did not meet its burden of proving, beyond a reasonable doubt, the allegations necessitating termination of parental rights as required by the ICWA. We reverse and remand.

## FACTS

On October 18, 1981, B.W. was born to Sharon Goose and Cornelius Walker. Goose is a member of the Minnesota Chippewa Tribe, Leech Lake Band, and Walker is a member of the Omaha Tribe of Nebraska. B.W. is an enrolled member of Goose's tribe and is eligible for, but not presently enrolled in, Walker's tribe.

Responding to reports of possible alcohol abuse, Hennepin County social worker Nancy Schaefer made an unannounced visit to B.W.'s home on April 28, 1986. Schaefer found Goose in the kitchen, apparently intoxicated, surrounded by empty liquor bottles and unable to respond to her inquiry as to the whereabouts of Goose's son, B.W. Returning later that day with the police, Schaefer again saw Goose intoxicated, trying to hide B.W. from her, and observed Walker also visibly intoxicated. The next day B.W., then age four, was removed from his parents' home by order of the Juvenile Court based on Schaefer's observations.

On May 1, 1986, Schaefer learned that B.W.'s paternal grandmother, living on the Omaha Tribe of Nebraska Reservation, was a potential placement for B.W. Schaefer did not inform the trial court or otherwise act on this information and never contacted the grandmother. The county's initial attempts to place B.W. with relatives on his mother's side were unsuccessful. B.W. was eventually placed with an Indian foster family not affiliated with either Goose's or Walker's tribes.

Goose entered a chemical dependency treatment program which she completed in July 1986. The trial court record shows that she had completed such treatment six times previously, with 1 to 12–month periods of sobriety in between treatments since 1978. Goose attended an aftercare program from July to November 1986 and was discharged for failure to attend in December 1986.

The county filed a petition for legal custody of B.W., which was settled by stipulation on December 12, 1986, when B.W. was adjudicated dependent. A court-ordered case plan called for Goose to participate in chemical dependency and domestic abuse programs. She entered an inpatient chemical dependency program at Anoka Regional Center in March 1987 and successfully completed the program in June with a recommendation that she attend a halfway house and Alcoholics Anonymous (AA) meetings.

Goose decided that she did not need a halfway house, though she attended AA meetings and maintained her sobriety. At a December 1987 disposition review, the trial court struck from the case plan the requirement for residential aftercare.

From July 1987 to June 1988, Goose attended AA meetings, increased her visitation with B.W., including some unsuper-

vised visits, and generally maintained her sobriety. It was agreed that B.W. would be returned to her home at the end of the school year.

On June 7, 1988, Schaefer found Goose intoxicated. Goose stopped attending AA meetings in July 1988, though she underwent another chemical dependency assessment on July 7, 1988, wherein it was recommended that she attend an Antabuse program.

On August 22, 1988, after drinking all day with Walker, Goose was present when he stabbed another person. He was arrested for and convicted of second degree assault.

After not having visited B.W. for several months, Goose contacted Schaefer about visitation in October 1988. At a meeting the two disagreed on whether Goose should discuss her lack of visitation with B.W. Schaefer denied visitation at that point.

The county filed a petition to terminate both parents' rights in January 1989 and only in anticipation of the termination trial were weekly visitation rights restored to Goose. Goose was seen drinking in January 1989 and canceled a visit with B.W. in May 1989 because she had been drinking.

The Omaha Tribe received written notification of the termination petition on March 20, 1989. At that time the tribe declined to intervene but, after a change in tribal administration, they petitioned the trial court on the day of trial either to transfer jurisdiction of the case to them or grant a 20–day continuance so they could intervene. In a letter to the trial court, they stated that they did not do so initially because the tribe and B.W.'s grandmother were led to believe that Goose's Minnesota Chippewa Tribe would be involved and serve as a placement for B.W. Upon learning that this was not possible, the Omaha Tribe decided to try to intervene and request placement of B.W. with his grandmother in Nebraska. The grandmother also made a formal petition for custody and submitted a favorable home study. The tribe's requests were denied as untimely and the grandmother's petition was denied as untimely and without merit.

The trial court found that there was no record of contact between B.W. and his grandmother. B.W. has, however, visited Nebraska and lived there for three months. His grandmother has also visited him in his foster placement.

At trial the county presented three witnesses, including master's-level psychologist Robert Resnick, court-appointed guardian ad litem Donovan Sargent, and social worker Nancy Schaefer.

Resnick, who has seen 12 to 24 cases involving Indians, did a psychological evaluation of B.W. in May 1989. He testified that unless there were a great likelihood of eventual return to his mother, reunification with her would be psychologically damaging and that if grounds for termination were found, it would be in B.W.'s best interest to remain with his foster parents. The county did not qualify him as an Indian child welfare expert.

Schaefer was found to be qualified, over the parents' objection, as an Indian child welfare expert under the ICWA. She was unfamiliar with nearly all of the subjects of Indian culture, child-rearing practices and Indian-based programs in Minnesota on which she was questioned by the parents' attorneys. She knew no words in any Indian languages, could not distinguish different Indian ceremonies, was ignorant of Indian history and literature and knew little about parenting programs for Indians in the state, never having participated in any of them.

She had been B.W.'s caseworker for the three years since his initial placement in the county's custody and presently had one other case involving Indians. Twenty-five percent of her caseload during the three years before trial involved Indian families. She has spent no time on any Indian reservations in Minnesota and a few hours on a reservation in Montana.

She testified that in her opinion, it was in B.W.'s best interest to terminate parental rights and that returning B.W. to his mother would likely subject him to physical or emotional harm, though she never saw him physically harmed nor was there any evi-

dence introduced of any such harm. She based her opinion of Goose on her inability to care for herself or B.W. when she was so intoxicated as to be unable to control her motor activity or her speech or to make appropriate judgments about B.W.'s safety. She also stated that Goose's history of drinking left B.W. at risk of abandonment and vulnerable to abuse by others. As for Walker, his visiting B.W. only five times in three and a half years was the basis for her opinion that his parental rights should be terminated.

Guardian ad litem Sargent was assigned to B.W.'s case when the child was removed from his parents' home in 1986. Sargent visited the foster placement monthly. Over the parents' objection, he also was qualified by the trial court as an Indian child welfare expert under the ICWA. Born on the reservation of the Minnesota Chippewa Tribe, White Earth Band, he left when he was 12 years old. He stated that he spends six days each year there, although appellants' expert, Shirley Coleman, urban representative of that tribe, testified that she had never seen him there. Sargent also testified to frequent attendance at certain Indian ceremonial gatherings. Like Schaefer, however, he was unable to answer most of appellants' attorneys' questions about Indian cultures, Indian child-rearing practices and parenting programs for Indians in Minnesota. He has been a guardian ad litem for three years and had eight Indian foster children as a licensed foster parent for two years.

It was his opinion that B.W. would be emotionally harmed by a return to his biological parents at the present time, saying such harm would occur if B.W. were returned "right now." In forming his opinion, he considered the continued alcohol use of both parents and their sporadic visitation, though he admitted that Goose, for most of B.W.'s placement in foster care, had visited the child. He was not asked, and offered no opinion, of the necessity for termination of parental rights.

Goose introduced testimony from four witnesses. Louise Valandra from the Minnesota Indian Women's Center (MIWRC) told of Goose's participation in the center's AA sessions, one-to-one counseling and support groups. She felt that termination at this time would be premature. Janice Standing Cloud of the division of Indian work noted Goose's participation in her domestic abuse program. She stated that women enmeshed in abusive relationships often go back to the abusers, as Goose did here. She also thought termination was premature.

Shirley Coleman, urban representative of the Minnesota Chippewa Tribe, qualified without objection as an Indian child welfare expert witness under the ICWA. She spent several years working in family services on two reservations. She thought there would be no harm in returning B.W. to his mother.

Katie Turner of the Minneapolis American Indian Center, an Indian and a parent, also qualified without objection as an Indian child welfare expert. She had worked for the Minnesota Chippewa Tribe as a permanency planner and adoptions worker and worked for the Indian Health Board for nine years. She worked with Goose in implementing her case plan. She acknowledged the negative impact of alcohol abuse on parenting and felt that B.W. should not be returned to Goose immediately, but could be returned to her if she is given a little more time to work on her problems. She also thought that termination was inappropriate and that B.W. would not be physically or emotionally harmed by a return to his mother.

At trial Walker admitted to being arrested, though not brought to trial, for assaulting Goose. He also stipulated to a court finding that he was convicted in 1959 for assault with a bottle as a weapon. He was in prison for the August 1988 assault at the time of the termination petition trial in July 1989. Schaefer testified that Walker visited B.W. only five times in the three and a half years that B.W. was in foster care before trial and that she was not aware of his whereabouts between mid–1986 and his incarceration in August 1988. It was revealed at oral argument that Walker underwent chemical dependency treatment in

prison; he is now living in a halfway house in St. Paul and attending college.

The trial court found that, beyond a reasonable doubt, returning B.W. to his mother or his father would be likely to cause him emotional and physical harm. The court found that a placement with the paternal grandmother would have a deleterious effect on B.W.'s need for stability. The trial court also found that Sargent and Schaefer were qualified Indian child welfare experts under the ICWA. After ordering the parents' rights terminated, the trial court found intervention by the Omaha Tribe to have been inappropriate. The parents appeal all of these rulings.

## ISSUES

1. Did the trial court err in applying evidentiary standards enunciated in *In Re Welfare of T.J.J.*, 366 N.W.2d 651 (Minn.Ct. App.1985), in qualifying Schaefer and Sargent as Indian child welfare experts under the ICWA?

2. Did the trial court err in finding that the county had proved the allegations in its petition for termination of parental rights "beyond a reasonable doubt" as required by the ICWA?

3. Did the trial court err in denying the Omaha Tribe's motion to transfer jurisdiction of this matter to the tribal court?

## DISCUSSION

### I

■ 25 U.S.C. § 1912(f) requires that a termination of parental rights be supported by:

(1) evidence beyond a reasonable doubt, including

(2) testimony of qualified expert witnesses.

In the memorandum accompanying its order terminating the parental rights of Goose and Walker, the trial court addressed the qualifications for expert witnesses under the relevant guidelines issued by the Bureau of Indian Affairs (BIA) and the additional requirements in the Minnesota DHS manual. The BIA guidelines provide that under the ICWA, a qualified Indi-

an child welfare expert should most likely be

(i) A member of the Indian child's tribe who is recognized by the tribal community as knowledgeable in tribal customs as they pertain to family organization and childrearing practices.

(ii) A lay expert witness having substantial experience in the delivery of child and family services to Indians, and extensive knowledge of prevailing social and cultural standards and childrearing practices within the Indian child's tribe.

(iii) A professional person having substantial education and experience in the area of his or her specialty.

Guidelines for State Courts, 44 Fed.Reg. 67,593 (1979). The DHS manual *adds* to paragraph (iii) the requirement that the professional have "substantial knowledge of prevailing social and cultural standards and child-rearing practices within the Indian community." DHS Manual, XIII–3586 (Jan. 30, 1987).

The parents contended at trial that neither Schaefer nor Sargent qualified under the BIA guidelines as adapted in the DHS manual.

The trial court cited *In Re Welfare of T.J.J.*, 366 N.W.2d 651 (Minn.Ct.App.1985), for the proposition that although the guidelines and manual "are appropriate * * * they do not singularly control the trial court." *Id.* at 655. The court in *T.J.J.* thus emphasized a trial court's familiar and customary discretion to recognize testimony as "expert" in nature; this authority led the trial court to qualify "one if not both of these individuals" as experts under paragraph (iii) of the BIA guidelines.

The holding in *T.J.J.* is, however, gravely undercut by a subsequent U.S. Supreme Court opinion, *Mississippi Band of Choctaw Indians v. Holyfield*, — U.S. —, 109 S.Ct. 1597, 104 L.Ed.2d 29 (1989). *Holyfield* concerned the adoption of twin babies born to Indian parents who resided on the Choctaw Reservation in Mississippi, but who were born off the reservation. The

parents immediately placed the twins with a non-Indian adoptive couple, the Holyfields, who went to the state court to process the adoption. After the birth and placement, the Choctaw tribe moved to set aside the adoption, claiming exclusive jurisdiction under the ICWA.

The case turned on whether the twins were to be accorded the domicile of their parents, though born off the reservation. The Mississippi Supreme Court ruled that under state law the children were not domiciled on the reservation. The U.S. Supreme Court reversed, ruling that the state law definition of domicile could not be used to defeat the purposes of the ICWA. *Holyfield*, —— U.S. at ——, 109 S.Ct. at 1609.

In *Holyfield* Justice Brennan, for the majority, sets out in great detail the background leading up to passage of the ICWA. In House and Senate hearings held over a three-year period, witnesses testified to a trend which resulted in the removing of 25 to 35 percent of all Indian children from their families and placement of them in adoptive homes, foster care or institutions. *Id.* at ——, 109 S.Ct. at 1600. The U.S. Supreme Court relied heavily on Minnesota statistics to document this trend, the high percentage of placement of Indian children in non-Indian homes and the psychological and social problems these adopted children have. *Id.*

The court in *Holyfield* observed that local non-Indian social agencies and state courts were part of the problem, reflected in the congressional finding in the first section of the ICWA, stating:

> [T]he States, exercising their recognized jurisdiction over Indian child custody proceedings through administrative and judicial bodies, have often failed to recognize the essential tribal relations of Indian people and the cultural and social standards prevailing in Indian communities and families. 25 U.S.C. § 1901[ (5) ].

*Holyfield*, —— U.S. at ——, 109 S.Ct. at 1601, 1606.

Nancy Schaefer's failure to contact B.W.'s grandmother in Nebraska illus-

trates the point made by the Supreme Court in *Holyfield:*

> One of the particular points of concern was the failure of non-Indian child welfare workers to understand the role of the extended family in Indian society.

*Id.* at ——, 109 S.Ct. 1601 n. 4.

The *Holyfield* court noted the overall purpose of the ICWA, namely to reverse the trend of placing Indian children out of their families and tribes, and noted that "state law that *did* tend to undermine the ICWA's purposes could not be taken to express Congress' intent." *Id.* at ——, 109 S.Ct. at 1609 n. 26 (emphasis in original).

The sole exception to the supremacy of the federal scheme in the ICWA over state law is contained in section 1921 of the ICWA itself:

> In any case where State or Federal law applicable to a child custody proceeding under State or Federal law provides a higher standard of protection to the rights of the parent or Indian custodian of an Indian child than the rights provided under this subchapter, the State or Federal court shall apply the State or Federal standard.

25 U.S.C. § 1921 (1982).[1] Thus, section 1921 *mandates* application of state standards which more stringently protect Indian tribal and parental rights than does the ICWA itself.

In the light of the U.S. Supreme Court's analysis of the problem and the role of the state courts in *Holyfield* and applying section 1921 of the ICWA, we conclude that we cannot recognize the vitality of the holding in *T.J.J.* leaving application of the evidentiary standards in the DHS manual to the discretion of state trial courts. We hold that the trial court here erred in applying that standard, though we do not criticize the trial court for applying existing Minnesota authority. However, in view of *Holyfield*, we feel it is essential to the recognition of the purposes of the ICWA that if a trial court does not apply the standards in the DHS manual, that court

---

**1.** *See also* 25 U.S.C. § 1903, subd. 1(ii) (definition of "child custody proceeding" includes any action resulting in termination of parental rights).

should make explicit findings as to why it chose not to require that expert testimony of a professional be qualified by showing "substantial knowledge of prevailing social and cultural standards and child-rearing practices within the Indian community." DHS Manual at XIII–3586.

We analogize to the rules trial courts must follow in sentencing prisoners in Minnesota. Both the case law and Minnesota Sentencing Guidelines require that when a trial court decides to depart from the presumptive sentence laid out in the guidelines, the judge must provide written reasons justifying the departure. Minnesota Sentencing Guidelines II.D; *see also Williams v. State*, 361 N.W.2d 840, 843–44 (Minn.1985).

The DHS manual is an explicit expression of state policy consistent with and carrying out the purposes of the federal ICWA. State courts should permit a deviation from these standards, but only for good cause explicitly reflected in written findings of fact by the trial court. Our holding here is buttressed by expressions of other state courts noting that a qualified "expert" witness under the ICWA must have expertise beyond qualification *as* a social worker. *Matter of Morgan*, 140 Mich.App. 594, 603 n. 3, 364 N.W.2d 754, 758 n. 3 (1985); *Welfare of Fisher*, 31 Wash.App. 550, 553, 643 P.2d 887, 888 (1982). *See also Matter of N.L.*, 754 P.2d 863, 868 (Okla.1988) (purpose of the "expert" is to provide the court with evidence of tribal child-rearing customs); *State ex rel. Juvenile Department of Multnomah County v. Charles*, 70 Or.App. 10, 16, 688 P.2d 1354, 1359 (1984), *rev. dismissed*, 299 Or. 341, 701 P.2d 1052 (1985) (experts should have "particular and significant knowledge of and sensitivity to Indian culture"); *Matter of Appeal in Pima County Juvenile Action*, 130 Ariz. 202, 207, 635 P.2d 187, 192 (1981), *cert. denied sub. nom. Catholic Social Services of Tuscon v. P.C.*, 455 U.S. 1007, 102 S.Ct. 1644, 71 L.Ed.2d 875 (1982) (witness lacking knowledge of tribal culture may not qualify as an "expert").

Non–Indian lawyers, social workers and judges perceive the necessity of terminating parental rights of Indian citizens through quite different cultural lenses in their attempts to help Indian children. Yet, as noted by the U.S. Supreme Court in *Holyfield*, state social welfare agencies and state courts contribute heavily to the very problems the ICWA is meant to remedy. The ICWA explicitly mandates procedures to be used in termination cases in an attempt to remedy a problem deeply examined by the Congress. If the petitioning party's witnesses are not conversant with Indian culture and child-rearing practices, the problems the Congress has tried to remedy may remain, despite the adoption of the Indian Child Welfare Act.

Having recognized that the trial court applied a standard we hold to be incorrect, we must determine whether, under the DHS manual, the county's witnesses qualified as Indian child welfare experts.

Nancy Schaefer, the non-Indian child protection worker, could qualify only under manual paragraph (iii). DHS Manual at XIII–3586 (Jan. 30, 1987). On the basis of the trial record, following the manual's requirement that the "expert" have "substantial knowledge of prevailing social and cultural standards and childrearing practices within the Indian community," she cannot qualify as an expert. Upon retrial of this matter, her testimony might be directed to other factors not in the record now, sufficient to qualify her. However, because a case worker deals with Indian families does not necessarily mean the person qualifies as an Indian child welfare expert.

Donovan Sargent's qualifications are less easily determined. Indian heritage alone does not qualify him as an Indian child welfare expert. Under the relevant DHS manual section, paragraph (i), his qualifications fall short. Although he is a member of B.W.'s tribe, according to the testimony in the record, he is not recognized by the tribe as knowledgeable in tribal customs. Under paragraph (iii) of the relevant manual section, he cannot, as an undergraduate student, qualify as a "pro-

fessional" with "substantial education and experience in his * * * area of specialty." *See* DHS Manual at XIII–3886. He may, however, qualify under paragraph (ii) of the manual section. His experience as a guardian ad litem and foster parent of Indian children and his personal experiences as a member of the Minnesota Chippewa Tribe may qualify him as a "lay expert." *Id.*

Assuming Sargent did give qualified expert testimony as required by the ICWA, this court must note that his testimony was confusing and equivocal. When asked whether the parents' rights should be terminated, he answered that B.W. would be harmed emotionally if he were returned to his parents "right now," implying that a delay might change matters.

## II

■ 25 U.S.C. § 1912(f) states that termination of parental rights cannot be ordered

> in the absence of a determination, supported by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical harm.

*Id.*

As noted above, this court holds that Nancy Schaefer's testimony cannot qualify as expert. Donovan Sargent, who possibly did qualify as an expert, gave equivocal testimony on "likely * * * emotional or physical harm" as a result of returning B.W. to his parents.

The "beyond a reasonable doubt" burden of proof is a clear and known standard; indeed, it is the highest burden of proof in our jurisprudence and we should be able to apply it here.

The parents assert that were this a criminal case, applying this burden of proof, this court should be hard pressed to affirm where the trial court failed to mention evidence produced by the defense which may have raised a reasonable doubt.

The trial court failed to account for the testimony of the parents' two witnesses, who undisputedly qualified as Indian child welfare experts. Ms. Turner and Ms. Coleman, Indian women with extensive ties to their tribes and several years of experience working with Indian families and children, both testified that termination of Sharon Goose's parental rights was inappropriate and that no physical or emotional harm would result if B.W. were returned to his mother.

Given the evidentiary standards in section 1912 of the ICWA, the non-expert nature of Schaefer's testimony, the equivocation in Sargent's testimony and the testimony of Coleman and Turner opposing termination, the evidence presented cannot constitute the necessary proof beyond a reasonable doubt, which proof must include qualified expert testimony. The expert testimony did not concretely support termination based on the likelihood of serious emotional or physical harm to B.W. upon his eventual return to his parents. This applies not only to Goose, but to Walker, who, it was revealed at oral argument, is presently out of prison and attending college. Remand is therefore necessary.

## III

■ At the time of the termination trial, B.W. was an enrolled member of his mother's tribe, the Minnesota Chippewa Tribe, Leech Lake Band. Although the child is eligible for enrollment in his father's tribe, the Omaha Tribe of Nebraska, that is not the "child's tribe" as defined in 25 U.S.C. § 1903, subd. (5), because his contact with the Minnesota tribe is more significant. *Id.* at (5)(b). This court was informed at oral argument that registration of B.W. in his father's tribe could be accomplished quickly and that his mother's tribe would accede to B.W.'s withdrawal from enrollment with them. We note that the Minnesota Chippewa Tribe has no appropriate tribal court to which jurisdiction could have been transferred and that they cooperated in forwarding the Omaha Tribe's faxed documents requesting transfer on the first day of trial.

■ Upon remand, the trial court is instructed to allow sufficient time for consid-

eration of this matter by the appropriate tribal authorities. If B.W.'s enrollment in his father's tribe is accomplished, the trial court must then entertain any request by the father's tribe to transfer jurisdiction of this matter to the tribal court pursuant to 25 U.S.C. § 1911(b):

> In any State court proceeding for * * * termination of parental rights to an Indian child not domiciled or residing within the reservation of the Indian child's tribe, the court, in the absence of good cause to the contrary, shall transfer such proceeding to the jurisdiction of the tribe, absent objection by either parent * * *.

■ The trial court may have been correct in denying such a motion on the day of the termination trial's commencement as untimely. However, we emphasize that it is essential to the purposes of the ICWA to allow appropriate tribal authorities to determine these matters according to tribal law, customs and mores best known to them. Since, as noted above, the state social service agencies and state courts are part of the problem, transfer of jurisdiction over Indian child custody matters to tribal authorities is mandated by the ICWA whenever possible.

## DECISION

The trial court erred in qualifying a non-Indian social worker as an Indian child welfare expert under the ICWA and in finding that there was evidence beyond a reasonable doubt, including expert testimony, requiring termination of the parental rights of these Indian parents. On remand the trial court shall allow sufficient time before retrial for consideration of a potential motion to transfer jurisdiction of this matter to the tribal court of the Omaha Tribe of Nebraska.

Reversed and remanded.