**In the Matter of the WELFARE OF M.S.S., Minor Child.**

**No. C1–90–882.**

Court of Appeals of Minnesota.

Jan. 22, 1991.

John Steven Lind, Indian Legal Assistance Program, Duluth, for appellant Father.

Marvin Ketola, Carlton County Atty., Robert E. Macauly, Jr., Asst. County Atty., Carlton, Patti S. Mallecoccio, Duluth, for guardian ad litem.

Considered and decided by PARKER, P.J., and FORSBERG and KALITOWSKI, JJ.

## OPINION

PARKER, Judge.

Elgin Smith appeals the termination of his parental rights to his daughter, M.S.S. He asserts that the petitioner county did not meet the "reasonable doubt" standard of proof necessary before termination

could occur under section 1912(d) and (f) of the Indian Child Welfare Act. We reverse and remand.

## FACTS

On June 7, 1983, M.S.S. was born to Elgin and Catherine Smith, who were married in 1980. Catherine is enrolled in the Minnesota Chippewa Tribe and Elgin is enrolled in the Wisconsin Winnebago Tribe. M.S.S. was eligible for enrollment in the Wisconsin Winnegabo Tribe only and on July 9, 1988, was so enrolled. She is Elgin Smith's only biological child.

In February 1984 the Cloquet, Minnesota, police and the Carlton County Human Services Department removed M.S.S. and her two half-sisters, J.A.P. and Y.L., from the Smith home. They did so after receiving reports from a school teacher that Elgin Smith was sexually abusing his two stepdaughters, J.A.P. and Y.L. No evidence of anyone sexually abusing M.S.S. was presented.

In April 1984 Carlton County filed a criminal complaint against Smith, alleging that he had sexually abused his two step-daughters. He pled not guilty to the charges and was subsequently convicted by a jury of one count of first degree criminal sexual conduct involving Y.L. The state dismissed the charge that he abused J.A.P. The trial court sentenced Smith to 43 months in Stillwater Prison. He had served 18 months before his appeal resulted in a reduction of his conviction to second degree criminal sexual conduct. The court then reduced his sentence to 21 months, with credit for his 18 months served; the court placed him on probation for the remaining three months.

After Smith's conviction, the state sent M.S.S. and J.A.P. to live with Catherine under protective supervision of the Carlton County Human Services Department. At that time, the court ordered Elgin Smith restrained from having any contact with M.S.S. until further order. On May 2, 1986, the county again removed M.S.S. and J.A.P. from the Smith home and placed them in emergency foster care. This time the county removed them because of allegations that Catherine's brother had sexually abused J.A.P.

After Smith's release from prison in June 1986, the trial court granted him supervised visits with M.S.S. However, the trial court's February 1987 order restrained him from having any contact with her.

In April 1987 the trial court adjudicated M.S.S. to be a dependent child. Carlton County filed a petition for termination of Elgin and Catherine Smith's parental rights in December 1987; Elgin Smith denied it.

On April 4, 1988, the date scheduled for the fact hearing, Smith informed the court that he was a Wisconsin Winnebago Indian. He claimed the hearing violated the Indian Child Welfare Act (ICWA) because his tribe was not notified of the proceedings. The trial court rescheduled the hearing for June 8–10, 1988, in order to meet the notification requirements.

On June 8 and 9, 1988, the trial court heard testimony regarding the petition for termination. The trial court then suspended part of the proceedings to allow the Winnebago Tribe to become more involved in the case. In the interim, M.S.S. was enrolled as a member of the Wisconsin Winnebago Tribe. On December 20, 1988, Elgin Smith appeared in the trial court with his brother John and John's wife, Virginia, proposing that permanent placement and custody of M.S.S. be given to his brother and sister-in-law. Smith's brother is a member of the Wisconsin Winnebago Tribe and has been a police officer for approximately 18 years; the couple were also licensed foster parents. The court did not address the proposal at that time.

On December 21, 1988, Smith sought to have the court approve a visit between M.S.S. and his brother and sister-in-law. The court indicated that it would allow visitation only if it were approved through Carlton County. The county never allowed the visit.

On January 23 and 24, 1989, the trial court resumed hearing testimony. Smith again requested that the court consider his proposal to place M.S.S. permanently with his brother in Wisconsin.

Naomi Russell, the representative for the Winnebago Tribe and the Tribe's Indian child welfare coordinator for the past seven years, testified that the Winnebago Tribe had previously handled placements such as the one proposed. She specifically recommended the acceptance of Smith's proposal.

Carlton County Human Services director Don Bacigalupo testified that he was made aware of the proposal before trial, but he still recommended termination.

Several witnesses were called to give opinions on whether Smith's parental rights should be terminated. The court certified eight witnesses—Naomi Russell, Don Bacigalupo, Debbie Peterson, Marilyn Mathaler, Jewell Anderson, Wayne DuPuis, Teddy Fosness, and Rhonda Trotterchaude—as experts qualifying under the ICWA. Several other witnesses also testified, but were not certified.

Mathaler is a member of the Wisconsin Brotherton Tribe and a St. Louis County social worker. At the time of trial, she had worked as a social worker for nearly 15 years, after having obtained a B.A. in sociology. Nearly one-third of her caseload involves Native Americans. She has had specific training in working with Native Americans and has been involved in many Native American cultural activities. Mathaler testified that she supports the termination. Smith objected to her certification as an expert.

Anderson is a member of the Minnesota Chippewa Tribe, was raised in an Indian home, and presently lives on the Fond du Lac Reservation. She is an R.N. and previously held jobs as senior program coordinator and community health nurse for the Fond du Lac Reservation. Anderson was guardian ad litem for M.S.S. between March 1984 and January 1988. Smith objected to her testimony as an expert.

In June 1988, Anderson testified she believed that long-term foster care in an appropriate Indian home was in M.S.S.' best interests. In January 1989, however, she said she believed that termination of parental rights was in M.S.S.' best interests based upon the fact that the parents had made no efforts in the interim toward reha-

bilitation. She believed termination should occur despite the proposal to place the child permanently with Smith's brother and sister-in-law. She testified that if M.S.S. were returned to her parents' custody today or in the foreseeably near future, she would be at risk of serious emotional or physical harm.

DuPuis is a Fond du Lac social worker and an enrolled member of the Minnesota Chippewa Tribe who was educated in the customs and traditions of the Indian way of life. He testified, without objection, as an expert. Though DuPuis admitted to having few contacts with the Wisconsin Winnebago Tribe, he supported termination as a step toward permanency for M.S.S. and in her best interests. He testified that serious emotional and physical damage could occur if she were returned to her parents' custody in the near future.

Fosness, another member of the Minnesota Chippewa Tribe and a Fond du Lac human services chemical dependency counselor, testified as an expert, without objection. She recognized that it was important for M.S.S. to remain in the Indian culture, but thought it unnecessary to be experienced in the Winnebago Tribe. Though she admitted to knowing little about Smith's brother and sister-in-law, she strongly recommended termination rather than permanent placement with them. She testified that she believed M.S.S. would be at risk of serious emotional or physical harm if she were returned to her parents' home at any time in the near future.

There was no objection to the testimony, as an expert, of Trotterchaude, a member of the Minnesota Chippewa Tribe and family planning consultant for the Fond du Lac Reservation. Trotterchaude represented M.S.S. as guardian ad litem from January through October 1988. She admitted to having had contact with Smith on only one occasion and knew little about his family in Wisconsin. Though she initially believed reunification to be in the child's best interests, she testified that she would agree only with termination at this time because the parents had failed to follow up on the programs offered.

Peterson, a child protection worker with a psychology degree who is employed by Fond du Lac Social Services, testified as an expert. Smith objected to her testimony being received as that of an expert because she had only one year of work experience and because she is not an Indian. She also recommended termination of parental rights.

Bacigalupo, who has a master's degree in social work, was accepted as an expert, without objection. He has been a social worker working with people of Indian descent since approximately 1968. Bacigalupo testified that he believed termination was in the best interests of M.S.S. and testified that he would not consider Smith's alternative plan. He further testified that if M.S.S. were returned home in the foreseeable future, it would likely result in serious physical or emotional harm to her.

Russell, a Potowatomi Indian who was the designated representative of the Wisconsin Winnebago Tribe in this suit, was also accepted as an expert witness. Though she is not an enrolled member of the Winnebago Tribe, she speaks their language and has been their Indian child welfare coordinator for the past seven to eight years.

She testified that returning M.S.S. to her parents would result in serious emotional damage to the child. She was not sure that termination of parental rights was in M.S.S.' best interests and recommended long-term placement of M.S.S. with relatives in Wisconsin to ensure that she remained enrolled in the Winnebago Tribe. She said she would agree with termination if it could be guaranteed that M.S.S. would remain a member of the Winnebago Tribe.

Smith offered the testimony of his brother and sister-in-law but the court refused it.

After the hearing, the trial court instructed the parties to submit written findings and arguments. Catherine Smith submitted proposed findings of fact and conclusions of law in February and April 1989. Elgin Smith submitted a written memorandum opposing the petition. Both argued that the petitioners had failed in their burden of proof under the ICWA.

The presiding judge issued an order terminating the parental rights on March 15, 1990. Elgin and Catherine Smith and Elgin's Wisconsin relatives have not been allowed to see M.S.S. since the hearing concluded in January 1989.

## ISSUES

I. Did the trial court err in finding proof of the petition for termination beyond a reasonable doubt, pursuant to section 1912(f) of the ICWA?

II. Did the trial court err in finding certain persons to be "qualified expert witnesses" pursuant to the ICWA?

III. Did the trial court use the proper standard in determining whether active efforts had been made to provide remedial services and rehabilitative programs to prevent the breakup of an Indian family?

## DISCUSSION

### I

Smith claims the trial court erred in finding that Carlton County had proved its petition for termination beyond a reasonable doubt, as required by section 1912(f) of the ICWA. A very stringent standard of review is applied to a trial court's order to terminate parental rights. *In re W.R.*, 379 N.W.2d 544, 547 (Minn.App.1985), *pet. for rev. denied* (Minn. Feb. 19, 1986) (citing *In re Chosa*, 290 N.W.2d 766, 769 (Minn. 1980)). This stringent standard is followed because of the presumption in favor of maintaining parental rights. *In re Clausen*, 289 N.W.2d 153, 156 (Minn.1980). The *Clausen* court indicated that even though some deference would be given to the trial court, the reviewing court "will closely inquire into the sufficiency of the evidence." *Id.*

The "reasonable doubt" standard of proof was enacted by Congress for cases involving termination of parental rights to Indian children. *W.R.*, 379 N.W.2d at 548. Use of the highest standard of proof known to our jurisprudence was specified to stop the all-too-common removal of Indian children from their Indian families and

tribal communities "by non-tribal governmental authorities who have no basis for intelligently evaluating the cultural and social premises underlying Indian home life and childrearing." *Mississippi Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 34–35, 109 S.Ct. 1597, 1601, 104 L.Ed.2d 29 (1989). The stricter standard in the ICWA requires that

> [n]o termination of parental rights may be ordered in such a proceeding in the absence of a determination, supported by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child.

25 U.S.C. § 1912(f) (1986).

Pursuant to section 1912(f), Smith argues that there was insufficient testimony by qualified expert witnesses to prove beyond a reasonable doubt that the continued custody of the child by the parent *or Indian custodian* is likely to result in serious emotional or physical damage to the child. We agree, for the reasons expressed in sections II and III following.

## II

■ Smith argues that Naomi Russell is the only witness who actually qualified as an expert witness under the ICWA. He contends that the other witnesses do not meet the requirements for an "expert" that have been established under the Bureau of Indian Affairs (BIA) guidelines and the Minnesota Department of Human Services (DHS) manual.

To determine whether witnesses qualify as experts pursuant to the ICWA, Minnesota follows the guidelines issued by the BIA and found in the DHS manual. *In re B.W.*, 454 N.W.2d 437, 443–44 (Minn. App.1990). These guidelines provide that under the ICWA, a qualified expert witness should be:

(i)   A member of the Indian child's tribe who is recognized by the tribal community as knowledgeable in tribal customs as they pertain to family organization and childrearing practices.

(ii) A lay expert witness having substantial experience in the delivery of child and family services to Indians, and extensive knowledge of prevailing social and cultural standards and childrearing practices within the Indian child's tribe.

(iii) A professional person having substantial education and experience in the area of his or her speciality and having substantial knowledge of prevailing social and cultural standards and childrearing practices within the Indian community.

*Id.* at 442; DHS manual, XIII–3586 (January 30, 1987).

This court in *B.W.* indicated that a guardian ad litem is not automatically qualified as an expert. *See B.W.*, 454 N.W.2d at 444–45 (guardian ad litem was not accepted as a professional but could possibly have qualified under paragraph (ii) of the DHS manual, since he was a layperson who had some knowledge of cultural standards and childrearing practices within the Indian child's tribe). This court also indicated that a non-Indian child protection worker could not qualify under paragraph (iii) unless having had substantial knowledge of prevailing social and cultural standards and childrearing practices within the Indian community. *Id.* at 444. We noted that merely because a case worker deals with Indian families, it does not necessarily follow that he qualifies as an Indian child welfare expert. *Id.* The experts should also be conversant with Indian culture and child-rearing practices, lest "the problems Congress has tried to remedy may remain, despite the adoption of the Indian Child Welfare Act." *Id.*

The trial court issued its order terminating parental rights prior to publication of our decision in *B.W.* Therefore, we must remand for reconsideration in light of *B.W.*

## III

■ Smith further contends that Carlton County failed to show that active efforts had been made to provide remedial services and rehabilitative programs designed to prevent the breakup of Smith's family, con-

sistent with section 1912(d) of the ICWA. He contends that such efforts must be found to have been proved beyond a reasonable doubt.

The ICWA provides:

> Any party seeking to effect a foster care placement of, or termination of parental rights to, an Indian child under State law shall satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that those efforts have proved unsuccessful.

25 U.S.C. § 1912(d) (1986).

Prior to this time, Minnesota courts have not found it necessary to discuss the standard of proof necessary under Section 1912(d). *See In re T.J.J.*, 366 N.W.2d 651 (Minn.App.1985). However, other jurisdictions have concluded that Congress did intend the reasonable doubt standard of section 1912(f) to be applied to the requirements of section 1912(d). *See In re L.N.W.*, 457 N.W.2d 17, 19 (Iowa App. 1990); *Matter of Morgan*, 140 Mich.App. 594, 364 N.W.2d 754, 758 (1985); *People in the Interest of S.R.*, 323 N.W.2d 885, 887 (S.D.1982).

In enacting the ICWA, Congress indicated its intent to diminish the effect of having culturally biased government officials, who perceive the necessity of terminating parental rights of Indian citizens through quite different cultural lenses, decide whether to terminate an Indian's parental rights. *See* 25 U.S.C. § 1901.

> One of the most serious failings of the present system is that Indian children are removed from the custody of their natural parents by nontribal government authorities who have no basis for intelligently evaluating the cultural and social premises underlying Indian home life and childrearing. Many of the individuals who decide the fate of our children are at best ignorant of our cultural values, and at worst contemptful of the Indian way and convinced that removal, usually to a non-Indian household or institution, can only benefit an Indian child.

*Holyfield,* 490 U.S. at 34–35, 109 S.Ct. at 1601 (citing Hearings on S.1214 before the Subcommittee on Indian Affairs and Public Lands of the House Committee on Interior and Insular Affairs, 95th Cong.2d Sess. (1978)). In view of the tragic results of this quite different focus on familial life, the importance Congress placed on requiring a higher standard of proof in parental rights termination cases can be readily understood.

Logically, this seems to be compelled: If termination of parental rights of Indian parents to their children can be ordered only upon a factual basis shown beyond a reasonable doubt (§ 1912(f)), and if termination cannot be effected without a showing of active efforts to prevent the breakup of the Indian family and a failure thereof (§ 1912(d)), then the adequacy of efforts and futility of them, as predicates to termination, must likewise be established beyond a reasonable doubt. Therefore, we recognize the reasonable doubt standard as appropriate in determining whether the petitioning party has complied with section 1912(d).

Smith contends that the "active efforts" and futility requirement of section 1912(d) were not proved beyond a reasonable doubt. He contends his proposal to place M.S.S. permanently with his brother and sister-in-law was clearly a remedial and rehabilitative measure designed to prevent the breakup of an Indian family which was ignored and prevented from happening by Carlton County and upheld by the trial court. He claims that his proposal must be attempted and thereafter be shown to have been unsuccessful before his parental rights can be terminated.

The BIA has established guidelines on the form that these remedial and rehabilitative services must take:

> These efforts shall take into account the prevailing social and cultural conditions and way of life of the Indian child's tribe. They *shall* also involve and use the available resources of the extended family, the Tribe, the Indian social service agencies, and individual Indian care givers.

Guidelines for State Courts, 44 Fed.Reg. 67,592 (Nov. 26, 1979) (emphasis added). Other jurisdictions have attempted to enlist the assistance of extended family members in their programs designed to prevent the breakup of the Indian family. *See L.N.W.*, 457 N.W.2d at 19 (party seeking termination required to demonstrate that services were also offered to extended family members); *In re Adoption of T.R.M.*, 525 N.E.2d 298, 310 (Ind.1988) (actions of adoptive parents to adopt and raise the child seen as active efforts to reunite the preexisting Indian family unit).

Although the county and trial court were not made aware of the existence of Smith's brother and sister-in-law or his proposed plan until late in the termination proceedings, we do not believe the reasonable doubt standard could have been met without consideration of this alternative plan. Therefore, we conclude the trial court erred in not having required the county to extend the focus of its efforts to the extended family and the Indian child's tribe. 44 Fed.Reg. 67,592. Merely to give his relatives priority·in considering preadoptive placement, as required by section 1915(b) of the ICWA, is not sufficient. Should the court find the proposed relatives to be qualified foster parents for M.S.S., the need for terminating Smith's parental rights might be obviated.

At issue upon remand, then, will be whether the evidence, including the testimony of experts qualified under the BIA/DHS guidelines, proves beyond a reasonable doubt that the continued custody of the child by the parents or Indian custodian is likely to result in serious emotional or physical damage to the child. This necessitates consideration of whether custody by Smith's brother and sister-in-law might be likely to result in similar damage to the child. Therefore, the trial court must examine the fitness of the proffered Indian custodians and determine whether the child's safety can adequately be ensured under the proposed plan.

In examining the proposal, the court must consider contributions of the child's tribe along with the detrimental effects of removing the child from the community in which she has lived. The court must also consider her ties to her half-sisters and the potential for maintaining those ties under the proposed plan.

### DECISION

We reverse and remand with instructions that the record be reopened and the trial court consider testimony and all evidence relevant to the alternative plan proposed by appellant.

Reversed and remanded.