In the Matter of the CUSTODY OF S.E.G., A.L.W., and V.M.G.

No. C4–93–1054.

Court of Appeals of Minnesota.

Nov. 16, 1993.

Anita P. Fineday, Cass Lake, for appellant Leech Lake Band of Chippewa.

Wright S. Walling, Walling & Berg, P.A., Minneapolis, for respondents E.C. and C.C.

Tim Faver, Beltrami County Atty., Shari R. Schluchter, Asst. County Atty., Bemidji, for respondent Minnesota Dept. of Human Services and Beltrami County.

Charles R. Powell, Bemidji, for guardian ad litem Diane White.

Hubert H. Humphrey, III, Atty. Gen., Laura Sue Schlatter, Asst. Atty. Gen., St. Paul, for Guardian Com'r of Minnesota Dept. of Human Services.

Shirley M. Cain, Edwards, Edwards & Bodin, Duluth, for amicus curiae Red Lake Band of Chippewa Indians.

Paul T. Minehart, Minneapolis American Indian Ctr., Minneapolis, for amicus curiae Minneapolis American Indian Center.

Native American Rights Fund, Boulder, CO, for amicus curiae Minnesota Chippewa Tribe.

Considered and decided by NORTON, P.J., and HUSPENI and SCHUMACHER, JJ.

## OPINION

HUSPENI, Judge.

The trial court granted the petition of non-Indians E.C. and C.C. to adopt three Indian children. The children's tribe, the Leech Lake Band of Chippewa, challenges the court's determination that there was "good cause" to deviate from the adoption placement preferences in the Indian Child Welfare Act, 25 U.S.C. § 1915(a) (1988) (the Act). We affirm.

## FACTS

Respondents E.C. and C.C. (the Cs), who are not Indians, seek to adopt three Indian children: S.E.G., born March 15, 1984; A.L.W., born July 20, 1985; and V.M.G., born November 27, 1987. The three children are biological sisters and are all enrolled members of appellant, the Leech Lake Band of Chippewa Indians (the tribe).[1]

---

1. Several other entities are participating in this appeal. Respondent Beltrami County, the county of financial responsibility, and the Commissioner of the Minnesota Department of Human Services, the children's guardian, support the tribe's position and urge that the trial court be reversed. The children's guardian ad litem, Diane White, who is Indian, supports the Cs and argues that the trial court should be affirmed. The Red Lake Band of Chippewa Indians, the

Throughout their young lives, these children have been subjected to numerous foster home placements. It is suspected that S.E.G. and A.L.W. have been victims of sexual or physical abuse, although it is not clear from the record who was the perpetrator of the abuse. The record does indicate that all three children have a history of parental abandonment. Parental rights to the children were terminated in December 1991.

The first foster placement occurred over seven years ago in January 1986 when A.L.W. was placed in the A. foster home. In September 1986 S.E.G. and A.L.W. were placed in the home of their uncle. S.E.G. and A.L.W. were returned to their birth parents in December 1986. In April 1987, the children's parents married and moved out of state, despite a court order forbidding such a move. Upon their return to Minnesota, S.E.G. and A.L.W. lived with their maternal grandmother. V.M.G. was born in November 1987, and has never resided with her parents.

All three children were placed in the H. foster home in February 1988. V.M.G. was placed in the R. foster home in March 1988 and S.E.G. and A.L.W. were also placed in the R. foster home with V.M.G. in April 1988. Due to sexual acting out by the children, the Rs asked to have the children removed.

The children were moved to the W. foster home in February 1989 where they stayed until October 1990. The children were abruptly removed from this home after sexual abuse allegations arose. Although the foster parents were cleared of the allegations, they did not feel they could continue to care for the children because of the children's special needs.

In October 1990, the children were placed in the L. foster home. Due to a marriage dissolution, the children were abruptly returned to the home of their uncle.

S.E.G. was placed in the PATH (Professional Association of Treatment Homes) foster home of the Cs, in April 1991. Meanwhile, A.L.W. and V.M.G. were placed in the L. foster home until the Ls asked to be

relieved of their duties. A.L.W. and V.M.G. were then also placed with the Cs in August 1991. At the time of the placement with the Cs, there were no Indian PATH foster homes available.

In January 1992, the children were placed in the preadoptive home of L.L. and B.L. Mrs. L. was $\frac{1}{16}$ Chippewa and an enrolled member of the Fond du Lac Band of Chippewa. This move was with little preparation and without any prior overnight visits. The children remained in this preadoptive placement only nine days and then were returned to the Cs' home.

In October 1992, the children were removed from the Cs' home and placed in an Indian foster home. That foster home asked to be relieved of its duties and the children were moved to the foster home of A.C., an Indian, on November 13, 1992, where the children currently reside.

All foster and adoptive placements were made within the preferences of the Indian Child Welfare Act, 25 U.S.C. § 1915(a) (1988), except for the placement with the Cs. In November 1992, the Cs filed a custody petition and sought to adopt all three children. The children's Indian tribe opposed the adoption and the matter proceeded to trial in March and April 1993.

Numerous experts and other witnesses testified on many issues including the needs of the children, the problems generally shared by Indian children who have been raised in non-Indian homes, and the availability of Indian homes. In an order issued May 20, 1993, the trial court determined that "good cause" existed to deviate from the adoption placement preferences in the Indian Child Welfare Act and granted the Cs' request to adopt all three children.

### ISSUES

Did the trial court err in determining that "good cause" exists to deviate from the adoption placement preferences in the Indian Child Welfare Act, 25 U.S.C. § 1915(a) (1988)?

Minneapolis American Indian Center and the Minnesota Chippewa Tribe have all been granted amicus curiae status and argue the trial court should be reversed.

1. What standard of proof should a trial court apply in determining whether there is "good cause" to deviate from the adoption placement preferences in the Act?

2. What standard of review should an appellate court apply in reviewing a trial court's determination that there is "good cause" to deviate from the adoption placement preferences in the Act?

3. What factors should a trial court apply in determining whether there is "good cause" to deviate from the adoption placement preferences in the Act? Was "good cause" established in this case?

4. May a child's need for permanence be considered in determining the child's extraordinary emotional needs? What factors should a trial court consider in determining a child's permanency need?

5. Is the evidence supported by qualified expert testimony? Did the tribe properly raise this issue on appeal?

6. Must a state court, in determining the custody of Indian children, show complete deference to the recommendations of the child's tribe?

## ANALYSIS

In passing the Indian Child Welfare Act of 1978, 25 U.S.C. §§ 1901–1963 (1988), Congress stated:

[A]n alarmingly high percentage of Indian families are broken up by the removal, often unwarranted, of their children from them by nontribal public and private agencies and that an alarmingly high percentage of such children are *placed in non-Indian foster and adoptive homes* and institutions.

25 U.S.C. § 1901(4) (emphasis added).

Thus Congress declared its policy to be to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families by the establishment of minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture, and by providing for assistance to Indian tribes in the operation of child and family service programs.

*Id.,* § 1902.

More recently, a task force commissioned by the Minnesota Supreme Court found that minority children were "vastly over-represented" within the foster care system. *Minnesota Supreme Court Task Force on Racial Bias in the Judicial System,* 82 (1993). In Hennepin County, Indian children represented 17 percent of out-of-home placements, even though the total minority population of Hennepin County is only 11 percent. *Id.* at 82–83. For Indian children in particular, their out-of-home placements exceeded white children by over 10 times. *Id.* at 83. Given the removal data, the task force found sufficient evidence to believe some bias must exist. *Id.*

The central issue in this case is whether there was "good cause" to deviate from the adoption placement preferences in the Act, which provides:

In any adoptive placement of an Indian child under State law, a preference shall be given, *in the absence of good cause to the contrary,* to a placement with (1) a member of the child's extended family; (2) other members of the Indian child's tribe; or (3) other Indian families.

25 U.S.C. § 1915(a) (emphasis added).

### I. *Standard of Proof*

■ In reviewing the trial court's conclusion that "good cause" exists to deviate from the adoption placement preferences in the Act, we must, as a threshold matter, determine the proper standard of proof which the trial court is required to apply in making that determination. Here, the trial court applied a "clear and convincing evidence" standard, and observed that this high standard was necessary to promote the stability and security of Indian tribes. Amici, the Minnesota Chippewa Tribe and the Minneapolis American Indian Center, argue the trial court applied the wrong standard of proof, and urge this court to adopt a "beyond a reasonable doubt" standard—the standard that is used to terminate parental rights under the Act.

*See id.,* § 1912(f). Amici, however, cite no case law to support their position.

 The Act itself is silent in regard to the standard of proof courts should apply in making a "good cause" determination, and research reveals no cases directly addressing the proper standard. If Congress does not indicate the standard of proof, resolution of the issue involves discerning legislative intent. *Steadman v. Securities & Exchange Comm'n,* 450 U.S. 91, 96 n. 10, 101 S.Ct. 999, 1005 n. 10, 67 L.Ed.2d 69 (1981). Ordinarily, legislative silence on standard of proof is seen as an intention that the preponderance of the evidence standard applies. *Cf. Grogan v. Garner,* 498 U.S. 279, 286, 111 S.Ct. 654, 659, 112 L.Ed.2d 755 (1991) (noting that federal Congress' silence on standard of proof issue is inconsistent with the view that it intended a higher standard of proof).

We believe it is unreasonable to assume that Congress, by its silence, intended to apply the preponderance of the evidence standard when determining whether "good cause" exists to deviate from the adoption placement preferences in the Act. In passing the Act, Congress noted that there is "no resource that is more vital to the continued existence and integrity of Indian tribes than their children." 25 U.S.C. § 1901(3). The United States Supreme Court has stated that the "good cause to the contrary" language in section 1915(a) is the "most important substantive requirement imposed on state courts." *Mississippi Band of Choctaw Indians v. Holyfield,* 490 U.S. 30, 36–37, 109 S.Ct. 1597, 1602, 104 L.Ed.2d 29 (1989).

Conversely, we do not believe that Congress intended to require that "good cause" to deviate from the adoptive placement preferences in the Act must be found beyond a reasonable doubt. *Cf.* 25 U.S.C. § 1912(e) (foster care placements under the Act must be supported by "clear and convincing evidence"). If Congress had intended application of such a heightened standard, it could have explicitly provided for such a standard just as it did with the termination of parental rights. *See* 25 U.S.C. § 1912(f). Moreover, to impose a beyond a reasonable doubt standard would take away the "flexibility" of state courts in applying the "good cause"

standard. *See In re Interest of Bird Head,* 213 Neb. 741, 331 N.W.2d 785, 791 (1983) (term "good cause" was designed to provide courts with flexibility in determining the disposition of Indian children).

Accordingly, we hold that the trial court did not err in determining that there must be clear and convincing evidence of "good cause" to deviate from the adoption placement preferences in the Act.

## II. Standard of Review

 The parties dispute what standard of review this court should apply in reviewing the trial court's determination that there was "good cause" to deviate from the adoption placement preferences in the Act. The Cs contend the standard of review is whether the trial court abused its discretion by making findings unsupported by the evidence or by improperly applying the law. *See Pikula v. Pikula,* 374 N.W.2d 705, 710 (Minn.1985). The tribe contends that this case involves the interpretation of a statute, a question of law, and, thus, the trial court's decision is subject to de novo review. *See Doe v. Minnesota State Bd. of Medical Examiners,* 435 N.W.2d 45, 48 (Minn.1989).

We conclude that the proper standard of review in this case is to ask whether the trial court abused its discretion. The tribe's contention that this case involves the construction of a statute and is therefore subject to de novo review would apply with equal validity to all custody proceedings governed by state law, since those proceedings involve application of factors set forth in Minn.Stat. § 518.17 (1992). It is clear, however, that custody proceedings under state law are reviewed under an abuse of discretion standard. *See Pikula,* 374 N.W.2d at 710. The fact that this case involves the Act does not alter the applicable standard of review.

The Alaska Supreme Court, in addressing whether "good cause" existed to deviate from the adoption placement preferences of the Act and place an Indian child with a non-Indian family, enunciated a standard of review identical to that which we adopt:

*A good cause determination is within the superior court's discretion. We will reverse an adoptive placement preference*

determination only if convinced that the record as a whole reveals an *abuse of discretion* or if controlling factual findings are clearly erroneous. Abuse of discretion is established if the superior court considered improper factors or improperly weighted certain factors in making its determination.

*In re Adoption of F.H.,* 851 P.2d 1361, 1363 (Alaska 1993) (citations omitted) (emphasis added); *see also In re Appeal in Maricopa County Juvenile Action No. A–25525,* 136 Ariz. 528, 534, 667 P.2d 228, 234 (App.1983) (the trial court did not abuse its discretion in declining to follow the preferences for adoptive placement); *In re Adoption of M.,* 66 Wash.App. 475, 832 P.2d 518, 522 (1992) ("[g]ood cause is a matter of discretion").

What constitutes "good cause" is unique to the individual facts of each case. Therefore, "good cause" is a factual finding subject to the clearly erroneous standard. *See* Minn. R.Civ.P. 52.01; *In re Welfare of T.K.,* 475 N.W.2d 88, 91 (Minn.App.1991). "Clearly erroneous" has been defined as "manifestly contrary to the weight of the evidence or not reasonably supported by the evidence as a whole." *Northern States Power Co. v. Lyon Food Prods., Inc.,* 304 Minn. 196, 201, 229 N.W.2d 521, 524 (1975).

A trial court's determination whether there is "good cause" to deviate from the adoption placement preferences in the Act is a determination that rests within the court's discretion. This court will find an abuse of that discretion only if the trial court's factual findings are clearly erroneous or the trial court considered improper factors in making its determination.

### III. Good Cause

■ The Act does not define the term "good cause" as used in section 1915(a). Thus, we must look to other sources for guidance. The Department of the Interior through the Bureau of Indian Affairs has issued guidelines (BIA Guidelines) to assist state courts in applying the Act and the "good cause" exception in Indian child custody proceedings. For purposes of adoptive placement, a determination of "good cause" not to follow the order of preference in the Act shall be based on one or more of the following considerations:

(i) The request of the biological parents or the child when the child is of sufficient age.

(ii) The *extraordinary physical or emotional needs of the child* as established by testimony of a qualified expert witness.

(iii) The *unavailability of suitable families* for placement after a diligent search has been completed for families meeting the preference criteria.

BIA Guidelines, F.3, 44 Fed.Reg. 67,583, 67,-594 (1979) (emphasis added).[2]

We find additional guidance in case law from other states. The Alaska Supreme Court stated that whether in a particular case there is "good cause" to deviate from the placement preferences depends on many factors

including, but not necessarily limited to, the best interests of the child, the wishes of the biological parents, the suitability of persons preferred for placement and the child's ties to the tribe.

*Adoption of F.H.,* 851 P.2d at 1363–64.

The Washington Court of Appeals stated that discretion must be exercised in light of many factors including

the best interests of the child, the wishes of the biological parents, the suitability of persons preferred for placement, the child's ties to the tribe and the child's ability to make any cultural adjustments necessitated by a particular placement.

*Adoption of M.,* 832 P.2d at 522 (citations omitted); *see also In re Interest of J.R.H.,* 358 N.W.2d 311, 321–22 (Iowa 1984) (court should consider the rich Indian heritage the

2. These guidelines are not regulations and are not intended to have binding legislative effect. Rather, following the guidelines will help assure that rights guaranteed by the Act are protected when state courts decide Indian child custody matters. Administrative interpretations of statutory terms are given important but not controlling significance. BIA Guidelines, Introduction, 44 Fed.Reg. 67,583, 67,584 (1979); *see also In re Adoption of T.R.M.,* 525 N.E.2d 298, 307 (Ind. 1988) ("guidelines are helpful but neither controlling nor binding upon state proceedings"), *cert. denied,* 490 U.S. 1069, 109 S.Ct. 2072, 104 L.Ed.2d 636 (1989).

child will be deprived of if placed in a white foster home).

We believe that when warranted under the facts of a particular case, all the factors set forth in the BIA guidelines and the case law may be considered by a trial court in determining whether there is "good cause" to deviate from the adoption placement preferences in the Act.[3]

■ In addressing the best interests of the children, we note that the Act applies a standard different from that typically applied by state courts in custody disputes. *See* Minn.Stat. § 257.025(a) (1992) (listing relevant factors in determining the best interests of the child). The Act presumes the interests of an Indian child are best served by placement with an extended family member. 25 U.S.C. § 1915(a)(1). Because Minn.Stat. § 257.025(a) does not provide enhanced protection for the rights of the parent or Indian custodian, section 257.025(a) is preempted by the Act. *In re Adoption of M.T.S.,* 489 N.W.2d 285, 288 (Minn.App.1992); *see* 25 U.S.C. § 1921 (if state or federal law provides a higher standard of protection to the rights of the parent or Indian custodian of an Indian child, the court shall apply the state or federal standard). Nevertheless, even though the Act may alter the focus of the best interests analysis, the Act does not change the cardinal rule that the best interests of the child are paramount. *Bird Head,* 331 N.W.2d at 791; *see also In re N.L.,* 754 P.2d 863, 870 (Okla.1988) (court should consider whether "good cause" exception in section 1915 is met by the child's best interests).

■ The legislative history of the Act indicates that the use of the term "good cause" was designed to provide state courts with "flexibility" in determining the disposition of a placement proceeding involving an Indian child. BIA Guidelines, Introduction, 44 Fed. Reg. at 67,584 (citing S.Rep. No. 95–597, 95th Cong., 1st Sess. 17 (1977)). Although 25 U.S.C. § 1915(a) establishes a federal policy that, where possible, Indian children should

remain in the Indian community, it should "not be read as precluding the placement of an Indian child with a non-Indian family." H.R.Rep. No. 95–1386, 95th Cong., 2d Sess. 23 (1978), *reprinted in* 1978 U.S.C.C.A.N. 7530, 7546.

■ The trial court concluded (applying factors (ii) and (iii) in the BIA Guidelines) that there was "good cause" to deviate from the adoption placement preferences in the Act because the children have "extraordinary physical and emotional needs" and because of the "unavailability of any suitable families for adoption" that meet the preference criteria. Furthermore, the court concluded the "best interests" of the children require "immediate placement" with the Cs.

■ 1. With respect to the unavailability of suitable families that meet the preference criteria, the trial court found:

> At the present time and in the foreseeable future there is *no Native American family* which has been found after a diligent search *willing to adopt the children.*

(Emphasis added.)

The tribe argues that there *are* Indian families available to adopt the children. Frederick E. Isham, Jr., a foster care adoption worker with the Minnesota Chippewa Tribe Human Services Division, testified that he had been actively recruiting an adoptive home for the children since August 1990, and that he had an active file of 48 available Indian homes. Isham would not speculate on whether one of these 48 homes would be an appropriate placement, but did state that there was a family in Missouri willing to take the children. Isham admitted, however, that this Missouri home had never been given specific information regarding the children's problems. Isham further testified that the children are not ready for adoption because they have various problems that must first be addressed. Valerie Seelenbinder–Capece, a PATH social worker, testified it could take at least two to four years for the children to

---

**3.** In this case the biological parents did not express a preference and thus this factor was not relevant to the trial court's decision. Further, although the guardian ad litem testified that all the children, especially the oldest, expressed a preference to live with the Cs, the trial court made no findings with regard to this factor. Therefore, we do not address the preferences of the children as a factor in our decision.

stabilize and work out some of their problems.

Other testimony indicated that there were no suitable family members available for adoption and that there is a shortage of Indian homes available. Furthermore, the children's guardian ad litem testified that Isham told her the children had been taken off the national adoption registry and would not be put back on for another five years.

We believe that the trial testimony supports the trial court's finding that there is no Indian family now or in the near future willing to adopt the children. The January 1992 preadoption placement of the children in the L. home lasted only nine days. No placements have since been attempted. A proper inference is that if there was an Indian home presently capable of permanently meeting the extraordinary needs of these children and willing to do so, placement in that home would have been attempted.

The tribe argues that the 11–month period from termination of parental rights in December 1991 until the children moved in with A.C. in November 1992, is not sufficient time to conduct a diligent search for an adoptive home. In fact, however, the tribe spent 15 months searching for an adoptive family prior to the children's placement with A.C. and had 19 months prior to trial to look for an adoptive family.

We decline to specify what might be a reasonable length of time to find an adoptive home. We recognize the difficulties that may arise in seeking to place three children, all of whom have special needs, in the same home. Unfortunately, such placement could not be arranged with an Indian family. While we are not insensitive to the tribe's conscientious efforts to find a suitable home for the children, we must recognize that at some point in time the best interests and extraordinary needs of the children may require that alternatives be considered. The trial court, after hearing all of the testimony, was in the best position to determine whether the tribe had sufficient time to find a suitable Indian family. The trial court's finding that at present or within the foreseeable future there is no Native American family

willing to adopt the children is not clearly erroneous.

■ **2.** With regard to the children's extraordinary needs, the trial court found:

The children have *extraordinary emotional and educational needs.* [S.E.G.] has special educational service needs, has emotional behavioral difficulties, is suspected to have been a victim of sexual or physical abuse, and has a need for therapy for emotional problems and social adjustments. [V.M.G.] has behavioral problems and a need for a structured behavioral program, has emotional difficulties resulting from neglect and instability. [A.L.W.] has behavioral problems including destructive acting out, severe emotional disturbance, is suspected of having been a victim of sexual or physical abuse and has a need for therapy.

The children have an *extraordinary need for permanence* and stability resulting from multiple placements, neglect, changes in family and school environments.

(Emphasis added.)

The evidence adduced at trial supports the trial court's findings. S.E.G. has been diagnosed as having severe adjustment disorder with depressed mood and reactive attachment disorder of infancy or early childhood; A.L.W. has been diagnosed as having an extreme case of posttraumatic stress disorder; and V.M.G. has been diagnosed as having extraordinary needs due to parental abandonment and multiple foster home placements. In sum, the evidence is virtually uncontradicted that all three children have extraordinary emotional needs. We cannot, however, end our inquiry at this point.

The BIA Guidelines provide:

In a few cases a child may need highly specialized treatment services that are unavailable in the community where the families who meet the preference criteria live.

BIA Guidelines, F.3 Commentary, 44 Fed. Reg. at 67,594. Based on this commentary, the tribe contends the trial court erroneously applied the law because any specialized services needed to meet the children's extraordinary needs can be obtained in the community

where A.C. resides. In fact the trial court specifically found that:

> The present emotional, cultural, educational and physical needs of the children are currently being met in the home of [A.C.] *except for the need for permanence.*

(Emphasis added.)

Accepting the tribe's general proposition that specialized services may be available in A.C.'s home, we must focus on the trial court's concern with permanency, and ask whether and to what extent a child's need for permanency may be considered in determining whether there is "good cause" to deviate from the adoption placement preferences in the Act.

### IV. *Permanency*

The trial court found:

> Expert testimony * * * indicates a *need for permanent placement* now and for the duration of their childhood and adolescence.

(Emphasis added.) The evidence adduced at trial clearly supports this finding. Numerous witnesses testified to the necessity of placing the children in a permanent home. For example, experts testified that the best form of treatment for S.E.G.'s emotional needs would be placement in a permanent adoptive home; that A.L.W. has an extraordinary need for an immediate "placement that will not change and will be permanent for her until she graduates from high school;" and that V.M.G. needs a "secure, calm, consistent environment for the long-term." Additionally, the guardian ad litem testified the children need a permanent, stable home.

The tribe and Beltrami County argue that the trial court erroneously elevated the need for permanency to a new "good cause" basis, thereby ignoring the adoption placement preferences in the Act. As a policy matter, the tribe and Beltrami County argue that if we judicially determine that children who are in need of permanence are an exception to the adoption placement preferences in the Act, nearly every Indian child currently in an out-of-home foster placement will be at risk for adoption in a non-Indian home. The availability of these many children for non-Indian adoption would, argue the tribe and Beltrami County, devastate the tribe and run directly counter to the strong policy statements of the Act.

We recognize the extreme importance to both Indian children and the tribe that the relationship between them be zealously guarded, fostered and nourished by those individuals and agencies charged with making placement decisions. We conclude, however, that the decision made by the trial court in the case of the three children here will not trigger the destructive consequences foreseen by Beltrami County and the tribe—consequences which all concerned in this matter wish to avoid.

Although the trial court certainly considered finding a permanent home for the children to be very important, the court did not create a new standard for determining "good cause" to deviate from the adoption placement preferences in the Act. Rather, the court merely considered permanence to be a necessary factor in meeting the extraordinary emotional needs of these particular children in this particular case. The many failed placements and resultant extraordinary emotional needs experienced by the children here serve to distinguish this case, we believe, from the cases of other Indian children presently in foster care.

The inextricable relationship between the need for permanency and the extraordinary needs of these children is evidenced in the testimony of Frederick Isham, who stated that there *were* Indian adoptive homes available, but that he would not consider the children available and ready for placement until their various problems were addressed and ameliorated. Such rationale must be deemed flawed, at least to the extent that expert testimony demonstrated that the very root causes of the extraordinary needs of these children can be traced in large measure to the lack of permanency evidenced by the disruptive and multiple placements they have experienced throughout the majority of their young lives. While we share the concerns raised by the dissent that white, middle-class standards of permanency may be misapplied in cases involving the Act, we believe that all children, whatever their cultural or ethnic

heritage, may develop extraordinary needs. The role of permanence in meeting the extraordinary needs of the three children in this case cannot be minimized.

In *F.H.*, 851 P.2d at 1365, the Alaska Supreme Court specifically held that the trial court properly considered the child's need for permanent placement. This was true, even though the Division of Family and Youth Services expressed an intent to immediately place the child with the mother's Indian cousin if the adoption did not go through. The court stated:

> The superior court properly considered F.H.'s situation if the adoption petition were dismissed. It was not clearly erroneous for the superior court to find that F.H.'s uncertain situation would have continued if the Hartleys were not allowed to adopt F.H.

*Id.; accord In re T.S.*, 245 Mont. 242, 801 P.2d 77, 80–81 (1990) (removal of Indian child from her stable and protected non-Indian environment would "devastate" the child and would have "long-term harmful effects" upon her).

The trial court did not err in this case when it considered the need for permanency as it related to the extraordinary needs of the children.

We do not intend in any way to diminish the importance of an Indian child's need to create and maintain ties to the Indian culture while also maintaining permanence of residency. We give particular credence to the arguments of amicus curiae Red Lake Band of Chippewa Indians that Indian children are best raised in Indian homes, that Indian children who are raised in white homes may suffer significant psychological problems, and that the loss of Indian children will adversely affect the viability of tribal communities and culture.

It is important that the Indian child's need for permanence be strengthened through ties to tribe and culture. Adoption of an Indian child by a white family, however, does not necessarily signal the loss of all cultural ties. In the present case, the Cs testified that, if allowed to adopt, they would follow through with culturally appropriate activities for the three children. We find this willingness on the part of the Cs a very important step in maintaining the children's cultural ties to the Indian community. The trial court indicated its recognition of the importance of these ties by ordering the Cs to submit an appropriate racial and cultural education plan.

We do not suggest that participation in occasional cultural activities is a total substitute for living day-to-day in an Indian environment. True appreciation and understanding of Indian culture undoubtedly can best be achieved by daily experience and exposure. We are compelled to recognize, however, that under the unique facts of this case, the children's need for a permanent and stable home, wherein their extraordinary needs can all be met, must take precedence over the benefits to be derived from day-to-day exposure to their cultural heritage.

The tribe also argues that testimony at trial[4] demonstrated that A.C. is currently meeting the children's need for permanency. We recognize that expert witness testimony indicates that A.C. is doing an excellent job in meeting the needs of the children, and can better meet the children's cultural needs than can the Cs. But the evidence equally supports the court's finding that A.C. has not satisfied the children's need for a permanent home. A.C. herself testified that she was unwilling to make any long-term commitment to the children, although she did not rule out adopting them. The guardian ad litem testified that A.C. never gave her any indication that she would be willing to take the children permanently. Conversely, the Cs have a successful track record with the children and are at present both willing to assume and capable of meeting the children's needs for a permanent and stable home.

---

4. The weight and credibility afforded conflicting testimony is not to be determined by the number of witnesses one produces. *Swanson v. Minneapolis St. Ry. Co.*, 252 Minn. 484, 486, 90 N.W.2d 514, 516 (1958). The trial court, sitting without a jury, is the sole judge of credibility of witnesses and may accept all or only part of any witness' testimony. *Roy Matson Truck Lines, Inc. v. Michelin Tire Corp.*, 277 N.W.2d 361, 362 (Minn. 1979).

In conclusion, a child's need for permanence may be considered in determining the child's extraordinary emotional needs, although by itself the need for permanence does not constitute "good cause" to deviate from the adoption placement preferences in the Act. In determining the need for permanence, a trial court must carefully consider the unique facts of each case, including, but not limited to, the length of time a child has been placed outside the natural parents' home, the number of placements, the child's emotional needs and the child's cultural need for permanence. Applying these standards, we hold that the trial court did not err in considering the permanency needs of the children in determining that their extraordinary emotional needs justified deviation from the preferred placements under the Act.

### V. *Qualified Expert Testimony*

The tribe argues that the testimony upon which the trial court relied came from persons who were not properly qualified as experts, and thus the findings are not supported by the evidence.

This argument has been improperly raised on appeal because no new trial motion was made in this case. Where there has been no motion for a new trial or amended findings, it is well-established that the scope of appellate review is limited to whether the record supports the findings of fact and whether those findings support the conclusions of law and the judgment. *Beasley v. Medin*, 479 N.W.2d 95, 98 (Minn.App.1992); *Kuchenmeister v. Kuchenmeister*, 414 N.W.2d 538, 541 (Minn.App.1987). Nonetheless, because of the important interests at stake, we will not summarily dismiss this issue. *See* Minn.R.Civ.App.P. 103.04 (this

court may review any other matter as the "interest of justice may require").

The Act itself does not address whether a "good cause" determination must be shown by "qualified expert testimony." *Cf.* 25 U.S.C. § 1912(f) (termination of parental rights under the Act must be supported by the testimony of "qualified expert witnesses"). The BIA Guidelines, however, do provide that the extraordinary physical or emotional needs of the child shall be established by the testimony of a "qualified expert witness." BIA Guidelines, F.3.(a)(ii), 44 Fed. Reg. at 67,594.

We agree with the BIA Guidelines and hold that the extraordinary physical or emotional needs of the child must be established by qualified expert testimony. Qualified expert testimony is necessary to provide the court with knowledge of the social and cultural aspects of Indian life and to diminish the risk of cultural bias. *N.L.*, 754 P.2d at 867.

The trial court, in its discretion, rules on the qualifications and competency of a witness to give opinion evidence. A ruling determining qualifications of an expert will not be disturbed unless there is no evidence that the witness had the qualifications of an expert or the trial court has proceeded upon an erroneous legal standard. *In re Welfare of T.J.J.*, 366 N.W.2d 651, 655 (Minn.App. 1985) (citing *In re K.A.B.E.*, 325 N.W.2d 840, 844 (S.D.1982)).

To determine whether witnesses qualify as experts under the Act, Minnesota follows the guidelines issued by the BIA and found in the Department of Human Services (DHS) manual. *In re Welfare of M.S.S.*, 465 N.W.2d 412, 417 (Minn.App.1991).[5] In the present case, the trial court's memorandum

---

5. Under the DHS guidelines, a qualified expert witness should be:

(i) A member of the Indian child's tribe who is recognized by the tribal community as knowledgeable in tribal customs as they pertain to family organization and childrearing practices.

(ii) A lay expert witness having substantial experience in the delivery of child and family services to Indians, and extensive knowledge of prevailing social and cultural standards and childrearing practices within the Indian child's tribe.

(iii) A professional person having substantial education and experience in the area of his or her specialty and having substantial knowledge of prevailing social and cultural standards and childrearing practices within the Indian community.

*In re Welfare of M.S.S.*, 465 N.W.2d 412, 417 (Minn.App.1991) (quoting DHS manual, XIII–3586 (January 30, 1987)).

references the DHS manual and there is no indication the court erroneously applied the factors.

It is true that several of the Cs' main witnesses were not expressly qualified as Indian experts despite their testimony concerning their experience and knowledge of Indian social and cultural standards. Likewise, some of the tribe's witnesses were not qualified as Indian experts even though they appear to meet the DHS criteria. Other witnesses called by the Cs and the tribe, however, were expressly qualified as Indian experts.

In its conclusions, the trial court stated that the extraordinary emotional needs of the children were established by the testimony of several "qualified experts." In its memorandum, the court reiterated that it relied on the testimony of "qualified expert witnesses." The trial court did not abuse its discretion in making these determinations. Accordingly, we conclude there was qualified expert testimony supporting the trial court's findings.

### VI. *Deference to Tribe*

█ Amici, the Minnesota Chippewa Tribe and the Minneapolis American Indian Center, urge this court to hold that where the tribe has formally intervened in a state court proceeding, the state court must adopt the recommendations of the tribe regarding placement of Indian children. Amici offer no case law or statutory support for this position, and we decline to make a rule that sweeps so broadly. The tribe's wishes are certainly an important factor to consider in determining the custody of Indian children. *See, e.g., In re Custody of A.K.H.*, 502 N.W.2d 790, 795 (Minn.App.1993) (tribal sovereignty should be respected in family relationships), *pet. for rev. denied* (Minn. Aug. 24, 1993). To adopt amici's position, however, would render a trial or the exercise of any trial court discretion meaningless, because the trial court always would be required to follow the tribe's recommendations regardless of the evidence adduced.

Further, an assertion that the trial court should be required to adopt the tribe's recommendation is not in accord with the Act's legislative intent. Although Congress recognized that great deference should be paid to the tribe's wishes, there is no suggestion of complete deference. The legislative history of the Act provides:

> While the committee does not feel that it is necessary or desirable to oust the States of their traditional jurisdiction over Indian children * * * it does feel the need to establish minimum Federal standards and procedural safeguards in State Indian child custody proceedings designed to protect the rights of the child as an Indian, the Indian family and the Indian tribe.

H.R.Rep. No. 95–1386, 95th Cong., 2d Sess. 19 (1978), *reprinted in* 1978 U.S.C.C.A.N. 7530, 7541. Additionally, the flexibility of the "good cause" standard necessarily implies some discretion on the part of the trial court. *See Bird Head*, 331 N.W.2d at 791. Accordingly, the Act does not contemplate that a state court must give complete deference to tribal recommendations with regard to the placement of Indian children. *Cf. In re Adoption of T.R.M.*, 525 N.E.2d 298, 306 (Ind.1988) (Act does not require "absolute deference" to tribal court judgments), *cert. denied*, 490 U.S. 1069, 109 S.Ct. 2072, 104 L.Ed.2d 636 (1989). Finally, because the best interests of minor children continue to be so critically important in both Indian Child Welfare Act and non-Indian Child Welfare Act cases, a certain trial court discretion must, of necessity, continue.

### DECISION

The trial court did not abuse its discretion in determining that the Cs established "good cause" to deviate from the adoption placement preferences in the Indian Child Welfare Act. Accordingly, we affirm the court's determination that the Cs shall be allowed to proceed with the adoption of S.E.G., A.L.W. and V.M.G.

**Affirmed.**

SCHUMACHER, Judge (dissenting).

I respectfully dissent from the majority's decision. I would reverse the trial court's determination that there is "good cause" to deviate from the adoption placement preferences in the Indian Child Welfare Act. 25 U.S.C. § 1915(a) (1988).

The separation of Indian children from their families is perhaps the most tragic and destructive aspect of Indian life today. H.R.Rep. No. 95–1386, 95th Cong., 2d Sess. 9 (1978), *reprinted in* 1978 U.S.C.C.A.N. 7530, 7531.

> In addition to the trauma of separation from their families, most Indian children in placement * * * have to cope with the problems of adjusting to a social and cultural environment much different than their own.

*Id.* In response to these concerns, Congress passed the Indian Child Welfare Act, 25 U.S.C. §§ 1901–1963 (1978).

> The most important substantive requirement imposed on state courts is that of section 1915(a), which, absent "good cause" to the contrary, mandates that adoptive placements be made preferentially with (1) members of the child's extended family; (2) other members of the same tribe; or (3) other Indian families.

*Mississippi Band of Choctaw Indians v. Holyfield,* 490 U.S. 30, 36–37, 109 S.Ct. 1597, 1602, 104 L.Ed.2d 29 (1989).

The Act is based on the fundamental assumption that it is in Indian children's best interests that their relationship to the tribe be protected. *Id.* at 50 n. 24, 109 S.Ct. at 1609 n. 24. Because the removal of Indian children from their cultural setting seriously impacts long-term tribal survival and has a damaging social and psychological impact upon individual children, it is imperative that the trial court's findings be carefully scrutinized.

The evidence does not support the trial court's finding that after a diligent search, there is an unavailability of suitable Indian families meeting the preference criteria. Foremost, only 11 months lapsed between the time parental rights were terminated in December 1991 until the children moved into their present home with A.C. Given the difficulties of placing three children with special needs together, I believe the trial court placed an unfair and unreasonable burden upon the tribe.

A diligent attempt to find a suitable family includes, at a minimum, contact with the child's social service program, a search of all county or state listings of available Indian homes and contact with nationally known Indian programs with available placement resources. BIA Guidelines, F.3 Commentary, 44 Fed.Reg. 67,595 (1979).

Foster care adoption worker Fred Isham testified that he had an active file of 48 Indian homes available. Although Isham would not speculate on the suitability of one of these homes, the evidence does not show that none of these homes would be an appropriate placement for the children. It is illogical to assume that the tribe could investigate these known homes as well as conduct a search on a national level all within less than a year's time. Moreover, I cannot agree with the court's finding that no Indian families will be available in the "foreseeable future." There is simply no basis to predict what may or may not occur in the near future.

Although the evidence does support the trial court's finding that the children have "extraordinary" emotional needs, the evidence also supports the court's finding that the children's present emotional, cultural, educational and physical needs are being met in A.C.'s home. Since the children's needs are currently being met, the tribe should not be pressured into finding an adoptive home. The failed placement in the L. home only goes to show that placement in an adoptive home must be carefully planned. Developing an adequate transition plan will necessarily take time. The court's decision in this case will only serve to force Indian tribes to move children into Indian homes without adequate planning and will likely result in more failed placements.

Where the children are in a stable Indian home and their needs are being met, such as in the present case, the children's tribe must be given sufficient time to find an adoptive home. As the majority states, it is difficult to specify what might be a reasonable length of time to find an adoptive home. That decision will necessarily turn on the facts of each case. Under the facts of this case, it is apparent to me that the tribe was not given sufficient time to find an adoptive home.

Moreover, it is not the role of trial courts or this court to second-guess the social service policies of Indian tribes. Apparently, the tribe has decided that the children are not ready for adoption due to their special needs. This decision should be respected. Contributing to the problem of the placement of Indian children in non-Indian homes is the failure of state officials and agencies to take into account the special problems and circumstances of Indian families and the legitimate interest of Indian tribes in preserving and protecting the Indian family. H.R.Rep. No. 95–1386, 95th Cong., 2d Sess. 19 (1978), *reprinted in* 1978 U.S.C.C.A.N. 7530, 7546.

The Commissioner of Indian Affairs has stated that one purpose of the Act is to address problems caused by the failure of state courts to recognize the cultural and social standards prevailing in Indian communities. *In re L.A.C.,* 8 Indian L.Rep. (Am.Indian Law.Training Program) 5021, 5022 (1981). In no area is it more important that tribal sovereignty be respected than in an area as socially and culturally determinative as family relationships. *Holyfield,* 490 U.S. at 34, 109 S.Ct. at 1601 (citing Hearings on S. 1214 Before the Subcomm. on Indian Affairs and Public Lands of the House Comm. on Interior and Insular Affairs, 95th Cong., 2d Sess. (1978) (statement of Calvin Isaac, Tribal Chief of the Mississippi Band of Choctaw Indians and representative of the National Tribal Chairmen's Association)). Nontribal governments often have no basis for intelligently evaluating the cultural and social premises underlying Indian home life and childrearing. *Id.* at 34–35, 109 S.Ct. at 1601.

Numerous witnesses testified as to the unique culture in Indian communities as well as the difficulty Indian children face when raised in white homes. For example, licensed social worker Penny King, a qualified Indian expert witness, testified that it is vital to the identity of Indian people that they know where they come from and that they have contact with their tribe and Indian people. Licensed social worker Lorraine Patch, an Indian who was raised in a white foster home since age nine, testified the Cs could not provide for the children's cultural needs except in a very superficial way. Psycho-therapist Michelle Gordon, who is Indian and has had extensive experience working with Indian children, testified that the children in this case feel shame because they are Indian and culture is important in raising Indian children.

This court's decision will take away the tribe's right to maintain the children in a *culturally appropriate environment.* Thus, Indian tribes will be forced to choose adoption over foster care. Yet nowhere in the Act is adoption favored over foster care. The trial court decided, and this court has affirmed, that the Cs should be allowed to adopt the children based primarily on the children's need for permanency.

I would hold that the trial court erroneously construed the Act to favor a permanent home placement over cultural heritage. It is clear from the legislative history of the Act that retaining a child's cultural heritage is of primary importance. The Act itself does not mention a need for permanence. This court has effectively created a new standard for finding "good cause" to deviate from the adoption placement preferences in the Act.

Elevating permanence to the level of "good cause" may seriously affect the viability of Indian tribes. I cannot so easily dismiss the concerns of the tribe and of Beltrami County that all children in foster placements will be at risk for adoption in a non-Indian home. Given the limited number of Indian homes available to adopt children, the importance placed on the majority's concept of permanency may seriously undermine the purposes of the Act. It is likely that more Indian children will be removed from the Indian community and placed in non-Indian homes, exactly the result the Act was intended to prevent.

Even if permanence is a factor in determining the children's emotional needs as the majority suggests, the concept of permanency has been misapplied in this case. Certainly all children have a need for permanence. The need for permanence, however, must be viewed from the perspective of the Indian family. The standard to be applied in meeting the preference requirements of section 1915(a) are the "prevailing social and cultural standards of the Indian community." 25

888

U.S.C. § 1915(d). Ignorance of Indian cultural values and social norms may result in decisions wholly inappropriate in the context of Indian family life. All too often a white, middle-class standard is applied, which, in many cases, forecloses placement with an Indian family. H.R.Rep. No. 95–1386, 95th Cong., 2d Sess. 23 (1978), *reprinted in* 1978 U.S.C.C.A.N. 7530, 7546. *See also* 25 U.S.C. § 1901(5) ("States * * * have often failed to recognize * * * the cultural and social standards prevailing in Indian communities and families.").

I believe the trial court erred by concluding that the children's need for permanence could be met through placement with the Cs. Applying an Indian standard, it is clear that the Cs cannot meet the children's permanency need because they cannot, on a daily basis, provide for the children's cultural needs. The children's cultural heritage can only be maintained by living in an Indian environment and practicing Indian rituals on a daily basis.

Lastly, I note that the proceeding in this case should never have taken place. Although the wishes of the Cs to adopt three special needs children are admirable, the Cs should not have had an expectation that they would be allowed to adopt the children. E.C. testified it was made clear that when the children were placed it was a temporary placement and a search for an Indian family was being conducted. C.C. further testified that Fred Isham had told her they could not adopt the children.

In conclusion, the trial court abused its discretion in finding "good cause" to deviate from the adoption placement preferences in the Act. The court's finding that there is an unavailability of suitable families after a diligent search meeting the preference criteria is not supported by the evidence. Additionally, the trial court improperly applied the concept of permanency in determining the children's extraordinary emotional needs. Therefore, I would reverse the decision of the trial court.